Dorothy M. THOMPSON et al., Plaintiffs,

v.

John J. BOYLE, Public Printer, Defendant.

Civ. A. No. 74–1101.

United States District Court, District of Columbia.

Oct. 1, 1979.

On Issue of Relief May 20, 1980.

As Amended July 8, 1980.

Nora A. Bailey, Ivins, Phillips & Barker, David M. Dorsen, Sachs, Greenbaum & Tayler, Roderic V. O. Boggs, Washington Lawyers Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, David H. Shapiro, Asst. U. S. Attys., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

This class action is brought by five named plaintiffs on behalf of the 324 female Journeyman Bindery Workers of all grades ("JBWs") employed in the Binding Division of the United States Government Printing Office ("GPO") on May 25, 1973. All of the named plaintiffs are grade 4 JBWs who have operated the Smyth sewing machines in the Binding Division as early as 1971.

The defendant, John J. Boyle, is the Public Printer of the United States. He is sued in his official capacity as chief administrative officer of the GPO, which produces printed matter for the United States government. Pursuant to 44 U.S.C. § 305, he classifies all positions in the Production Department, which includes the Binding Division, and establishes the wages paid for these positions.

The plaintiffs allege that the defendant has continued to engage in patterns and practices of sex discrimination against the class in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e et seq., and Executive Order 11478, 34 F.R. 12985 (1969), as amended by Executive Order 11590, 36 F.R. 7831 (1970). Plaintiffs also allege that defendant's practices violate the Equal Pay Act of 1963, 29 U.S.C. § 206(d), which became applicable to the defendant by 1974 amendments to the Fair Labor Standards Act, Pub.L. 93–259, § 6(a)(1).

After exhausting their administrative remedies concerning their Title VII and Equal Pay Act claims, the plaintiffs filed suit on July 24, 1974. The Title VII class was conditionally certified pursuant to Fed. R.Civ.Proc. 23(b)(2) on December 4, 1974. The case was originally tried before the late Judge Waddy in March, 1978, but Judge Waddy died before issuing a final decision; and a new trial was held before this Court from March 7, 1979 through March 22, 1979. At the time of trial, the named plaintiffs and 191 other members of the Title VII class had filed consents to become members of the Equal Pay Act class.

The primary issues before the Court may be stated as follows:

(1) Whether the defendant's requirement that JBWs complete a four-year apprenticeship program before attaining craft bookbinder status is a pattern and practice of sexual discrimination which violates Title VII of the Civil Rights Act;

(2) Whether the defendant's classification of all JBW positions as noncraft positions, with lesser pay and opportunities for advancement than those available to craft employees, is a pattern and practice of discrimination under Title VII;

(3) Whether the defendant's rule that only craftsmen may compete for supervisory and printing specialist positions constitutes a pattern and practice of sexual discrimination in violation of Title VII;

(4) Whether the defendant violates the Equal Pay Act by refusing to pay wages to JBWs equal to those paid to bookbinders for jobs the performance of which require equal skill, effort and responsibility and are performed under substantially equal working conditions, and whether any such violation is willful.

On the basis of the following findings of fact and conclusions of law, with certain exceptions, these issues are resolved in favor of the plaintiffs. The Court will conduct further proceedings to determine the relief to which the plaintiffs are appropriately entitled.

## I. FINDINGS OF FACT.

A. *GPO and Industry Practices.*

The Binding Division of the GPO is organized on a production line basis to perform all of the hand and machine functions necessary to assemble hard and soft-covered books, pamphlets, bills, passports and the Congressional Record.

Employees in the Binding Division are classified as follows: 1) craft or bookbinder; 2) craft-uprate, earning salaries above the regular craft rate; 3) noncraft, including JBWs and unskilled Printing Plant Workers ("PPWs"), and general grade ("GG"). Craftsmen and craft-uprates supposedly perform jobs which have traditionally been recognized in the printing trades as skilled trades or crafts. These jobs require a four-year apprenticeship. Noncraft employees perform tasks which have been considered unskilled or semi-skilled. Only craftsmen are entitled to compete for supervisory and printing specialist positions.

Regardless of the tasks to which they are actually assigned, all craft employees receive higher wages than noncraft employees. All bookbinders earn $11.16 per hour, regardless of the duties they actually perform. In contrast, the noncraft JBWs are categorized according to job grades 5, 4, 3

and 2, and perform different tasks according to their grade. The five grade 5 JBWs are considered work leaders and they currently earn $8.01 per hour. The 36 grade 4 JBWs, including the five named plaintiffs, who operate the Smyth sewing machines, are paid $7.59 per hour. Grade 3 JBWs operate the Oversewing and Singer sewing machines, earning $7.37 per hour. Grade 2 JBWs, who comprise the majority of the work force, earn $7.17 per hour.

In 1973, 2,015 of the 3,977 Production Department employees were craftsmen. Males held approximately 1,980 of these positions, and 35 females held the remainder. All first-line supervisory positions were retained by males. There were 1,184 positions in the Binding Division. All of the 279 craft bookbinders were males, while 324 of the 325 noncraft JBWs were females. Approximately 80% of the 580 PPWs were males. Approximately 82% of the females in the Production Department as a whole were employed in the Binding Division. As of October 31, 1978, the Binding Division employed 241 craft bookbinders, all but one of whom were male, and 246 noncraft JBWs, all but one of whom were female. The Binding Division still has no female supervisors.

Approximately 75 to 80% of the 279 male bookbinders employed in the Binding Division in 1973 operated various industrial machines used in the bookbinding process. The remaining 20 to 25% of the bookbinders performed some hand work and small machine operations. Only hand bookbinders in the Library Section perform hand craft operations.

Grade 5 JBWs, or Bindery Worker Supervisors, direct JBWs under their supervision. However, they are not permitted to discipline or evaluate JBWs, or to control their leaves; they also receive lower wages than first-line supervisors. The Smyth, Oversewing and Singer sewing machines, operated by grade 4 and 3 JBWs, are the only machines in the Binding Division not operated by bookbinders. JBW machine operators perform the same set up, adjustment and operation functions on their machines that bookbinders perform on the major machines which they operate.

There are two methods by which GPO employees may obtain bookbinder or craft status. The first method is a four-year apprenticeship program, which the GPO has sponsored since 1922; by which some craftsmen employed in the Production Department have been trained. The last GPO apprenticeship class began in 1974. At that time it was announced that the program probably would not be resumed. Only a limited number of GPO bookbinders have completed the GPO apprenticeship program in binding. The remainder, presumably, attained bookbinder or craft status through the second method. This method consists of certification for appointment by a rating panel authorized by the Civil Service Commission. To obtain bookbinder status through this method, one must (1) either complete a four-year apprenticeship in binding or have four years of practical experience, which is substantially equivalent to a four-year apprenticeship and (2) also possess one-year's experience as a journeyman bookbinder.

JBWs are the only noncraft employees other than clerical workers who must meet a minimum experience level to be hired. JBWs are required to serve a two-year apprenticeship in the printing industry and to possess some skills before they enter the GPO. In addition to the two-year apprenticeship required of all JBWs, grades 3 and 4 JBW machine operators must serve an additional eighteen months of training on their machines.

It is the defendant's position that, despite their apprenticeships and job experience, JBWs may attain craft status in the bindery only by entering and completing the GPO four-year apprenticeship program, or by gaining equivalent experience in the private binding industry.

Although under no obligation to do so, the GPO patterns its wage scales, general manning practices, and divisions between craft and noncraft occupations on practices maintained in private industry. Tradition-

ally, it has not been possible for women to obtain craft bookbinder status in the industry, either by undertaking a four-year apprenticeship program, or by obtaining equivalent experience. While men have held skilled positions, women have been permitted to undertake only tasks considered noncraft, which entail only two-year apprenticeships. Major industrial machines have been set up and operated by men, who have been assisted by women. The only major machines operated by women are the sewing machines. Men perform hand binding tasks. Women also perform various hand tasks, including hand sewing, and serve as assistants on the machines operated by men. This widespread practice in the trade is evidenced by the fact that as late as 1969 the Constitution and By-Laws of the International Brotherhood of Bookbinders (the predecessor of the Graphic Arts International Union, separate locals of which currently represent bookbinders and JBWs in the GPO) provided different registration requirements for men and women; i. e. a four-year apprenticeship period for men and a two-year apprenticeship for women; classified bindery work as men's and women's work; set women's wages at not less than 70% of journeymen's, or bookbinders' wages; and stated in Section 64 that "Bindery women shall not be permitted to perform any work classified as journeymen's work, except in a case where a journeyman is not available." [1]

**B.** *The Classification of JBW and Bookbinder Positions.*

Prior to the filing of the administrative complaint in this case, grade 4 JBWs, who operate the Smyth sewing machine, made several attempts, beginning in 1963, to have their positions reclassified as craft positions and/or to gain credit toward the four-year craft apprenticeships for their two-year apprenticeships and machine experience. In a 1966 request for reclassification, the JBWs alleged that the classification violated the

---

1. It has thus been all but impossible for women to obtain training, equivalent to that of the GPO bookbinder apprenticeship program, in private industry. Significantly, GPO has continued to enter into labor contracts with sepa-

rate locals of the Graphic Arts International Union which admit only men or only women, thereby adhering to the inequalities of training and classification within the private industry as a whole.

Equal Pay Act of 1963. In response to an unsuccessful attempt in 1972, the then acting Public Printer stated that a full investigation had been made of the matter. However, the defendant was unable to provide the plaintiffs with a copy of this supposed investigation or name the methods employed or the management employees who participated in it.

1. *The O'Connell testimony: Smyth machine operations are equal to bookbinder machine operations in difficulty, responsibility and qualifications.*

For purposes of the administrative proceeding in this matter, the defendant requested that the Civil Service Commission appoint an investigator to conduct an investigation of job classification issues raised in the complaint on the defendant's behalf. The Civil Service Commission appointed its regular employee, Mr. James R. O'Connell, who is broadly experienced in job classification and position management in industrial, professional and scientific areas. Mr. O'Connell has been responsible for more than 2,000 job classifications during his federal employment, and is qualified as an expert on position classifications. Using Civil Service Commission standards, he performed a job comparison study of the Smyth sewing machine and the machines set up and operated by bookbinders. Mr. O'Connell followed standard Commission procedures, and based his conclusions on his own observations and the answers of defendant's employees to particular questions. The defendant offered no objection, at the time of the study, to the 25 machines selected by Mr. O'Connell for his study.

Mr. O'Connell concluded that there is no rational basis for distinguishing the grade 4 JBW Smyth operation from work performed by virtually all bookbinders. With few exceptions, Mr. O'Connell was persuaded that the difficulty, responsibility, and qualifications required for all bookbinder machine operations were equal to those required on the Smyth assignment. His evaluation, using these terms, was identical in substance to the assessment of skill, effort, and responsibility required under the Equal Pay Act. His conclusions were stated for purposes of the administrative investigation (*see* plaintiffs' exhibit 1, apps. 14 & 16), and were reiterated and amplified in his testimony before the Court in March, 1978 and March, 1979.

Mr. O'Connell found it significant that bookbinders and sewing machine operators work as part of one production process— both in physical proximity as well as within the same organizational structure. Thus, the working conditions and materials handled by the two groups are identical. He observed that each machine operator's job, including that of the Smyth operators, requires manual dexterity, mechanical aptitude, attention to detail, and a sense of responsibility for the machine and the product. He concluded that only the four quad folder machines in the bindery require more physical and manual dexterity to set up and adjust than does the Smyth sewing machine. Defining job content as an analysis of the specific tasks performed for a specific job, Mr. O'Connell found that all the bookbinder machine operations and the Smyth operation involved substantially the same job content. He stated that the Smyth machine operation was virtually identical to the bookbinder machine operations. Perhaps most significantly, he found that, to the extent difficulty, qualifications, and responsibilities could be separately evaluated among the machines, the Smyth operation was more closely related to many of the bookbinder operations than certain bookbinder operations were to one another.

Mr. O'Connell's conclusions as to the comparability of Smyth machine operations and bookbinder machine operations are supported by the statement of H. Kenneth Kingsbury, then Superintendent of the Bindery, at the administrative proceedings. Mr. Kingsbury acknowledged that several machines operated by craft bookbinders are not as complicated to operate as the Smyth. Specific machines mentioned were the stamping machine, the nipper, the stripping machine, the cutter and the tipping machine. William Hammill, defendant's Director of Personnel at the time, concurred in Mr. Kingsbury's conclusions as to these machines. Mr. Kingsbury also stated that he knew of no management reason for ex-

cluding the Smyth operator function from the bookbinder craft other than that GPO management adhered to the manning practices of private industry, which so categorized them. He explained the inclusion of less complex machines than the Smyth in the bookbinder tasks on the ground of industry tradition.

Mr. O'Connell's conclusions as to the equality of the Smyth operator function with bookbinder operator functions stands unrefuted by any credible evidence presented by the defendants. For the purposes of grade 4 JBW claims under Title VII and the Equal Pay Act, the Court accepts his conclusion that the Smyth sewing machine operations are more like many bookbinder machine operations in skill, effort, and responsibility than many bookbinder machine operations are like one another.

2. *The Gottlieb testimony: The skill, effort, responsibility, and working conditions required for JBW positions in general is "substantially equal" to that required for bookbinder positions.*

Plaintiffs supported their evidence as to their Equal Pay Act and Title VII claims through the testimony of Bertram Gottlieb. Mr. Gottlieb is an industrial engineer with 30 years of experience in job classification, evaluation, and wage incentive plans. He has had extensive experience as an arbitrator and was industrial staff engineer for the AFL-CIO for twelve years. He is qualified as an expert in industrial engineering and personnel classification.

Over a fifteen-day period, Mr. Gottlieb performed an on-the-job analysis of all the machine and hand functions at the bindery. He observed normal job operations, including set ups and changeovers, and spoke to employees at the bindery. When Mr. Gottlieb performed his study, defendant did not dispute plaintiffs' contention that individual bookbinders performed individual primary tasks. Therefore, he did not attempt to evaluate the accuracy of this contention. However, his findings are consistent with the truth of this contention. For the study, Mr. Gottlieb evaluated the skill, effort, responsibility, and working conditions under which individual bookbinder and JBW hand and machine operations are performed. He defined skill as basic knowledge that must be brought to the job, experience needed to meet the employer's standards, and ingenuity or initiative called upon in the performance of the job. His definition of responsibility included responsibility for equipment and material, nonsupervisory responsibility for the work of others, and responsibility for the safety of others. Effort included both physical and mental effort.

Based on his observation of JBW and bookbinder functions, Mr. Gottlieb found that within the JBW functions, the Smyth sewing machine required the greatest skill, effort, and responsibility, the Oversewing machine involved somewhat lesser requirements, and the Singer sewing machine involved the least of these factors. He determined that the skill, effort, and responsibility required to operate the Smyth is substantially equal to that required to set up, adjust and, in some cases, operate certain bookbinder machines. These machines include:

Gathering-Stitch portion of Gathering Units
Inset, Stitch and Trim
Round, Back, Crash, Line Unit
Moffett Automatic Saddle Sewing Machine

In Mr. Gottlieb's opinion, the following bookbinder machine functions, including set up, adjustment and, in some cases, operation, were equivalent to JBW oversewing functions:

Three-Wing Casing In Machine
Casing In and Building In Machine
Tipping Machine
Flat Bed Cutter
Rotary Board Cutter
Trimmers
Cameron Cloth Cutter-Slitter
Gang Stitchers
Nipper-Gluer
Stripping Machine
Perforator/Scorer
Wrapping and Carton Sealing
Magnacraft Mailer
Book Carton Machine
Upright Smashing Machine
Index Cutting Machine

He found the following bookbinder machine duties substantially equal to JBW Singer duties:

Drills
Punches
Round Cornering
Automatic Sheet Counting
Crimping and Scoring Machine

Mr. Gottlieb testified that the skill required of bookbinders assigned to the pen ruling and casemaking machines was greater than that required of Smyth operators. He considered the hot stamping machines too different from other binding machines to permit a comparison among them, and felt that he had not observed the adhesive binder sufficiently to permit a comparison. He further determined that all of the bookbinder and JBW machine and hand functions are performed under similar working conditions: all are performed at similar lighting, heat and noise levels, and all work with the same paper products. He found the danger element to be similar on all machine operations involving moving parts.

Mr. Gottlieb supported his findings by detailed analyses of the adjustment, changeover and operation of each machine. He testified that adjustments on all the machines can be performed with simple tools; special adjustments and observations are unnecessary and judgments are possible through naked eye measurements. He found that the level of responsibility of bookbinders as to all machines, already found comparable to the various JBW operations, was not substantially increased by the assistance of JBWs or PPWs, because bookbinders have no responsibility for the level or quality of their assistants' work. With respect to his assessments of physical effort, Mr. Gottlieb compared the frequent moving of light objects required of non-automatic-feed Smyth and Oversew machine operators with the more strenuous, but less frequent movements required of particular bookbinders.

Hand work performed by both JBWs and bookbinders as supplements to their primary duties generally requires little skill. However, it appears that, with the exception of hand work in the Library Section, performed only by bookbinders, hand work performed as the primary duties of bookbinders and JBWs at the bindery may be seen as part of a single, qualitatively similar continuum. Various bookbinder and JBW tasks require skill, effort and responsibility at levels interspersed on this scale.

All agree that work performed by bookbinders, in the Library Section only, requires a substantial period of apprenticeship in addition to the ordinary bookbinder period. Hand library tasks are qualitatively different from the tasks of other bookbinders as well as JBWs. No other bookbinder tasks require the fine hand work regularly required in the Library Section.

Mr. Gottlieb also did an exhaustive study of hand functions performed as primary duties by bookbinders and JBWs. His study supports the conclusion that some hand work performed by JBWs and bookbinders as their primary duties is substantially equal in skill, effort, and responsibility. However, while Mr. Gottlieb's study on hand functions, like his study of machine operations, is painstakingly detailed, it would seem that the actual requirements of hand operations are inherently more difficult to measure. Therefore, the Court declines to rely upon Mr. Gottlieb's study of hand functions and finds the more general conclusions of Mr. O'Connell more useful for the purposes of this case. Mr. O'Connell explained that the comparability of these hand functions cannot be assessed "in absolute terms." He observed as follows:

For example, the Bookbinders that spread glue on pads perform work of such a level of difficulty that virtually all Bindery Worker hand operations including the simplest are comparable. However, the functions of inserting and insetting, and hand and machine sewing are the only functions which I personally observed, and considered to be comparable to most work performed by Bookbinders. However, the above Bindery Worker functions are not isolated; they constitute a significant body of work within the Binding Division.

I do not consider a job by job comparison of Bindery Worker and Bookbinder functions to be the most significant indicators of the comparability of these two occupations. *Even more significant is the fact that both occupations overlap in a broad range of difficulty of hand bindery work.*

Plaintiff's Exhibit No. 14.

The determination that JBW and bookbinder hand work is similar in kind is further supported by the defendant's management changes since the commencement of this suit. As of approximately September, 1978, the defendant changed the Passport Inspection task from a job performed by a single bookbinder to a position performed by rotating grade 2 JBWs. At the same time, the daily production requirements for the job were increased from 10,000 to 12,000 passports. There appears to have been no meaningful change in the job duties and the JBWs who were placed on this task were given no wage or status increase.

Mr. Gottlieb's conclusions as to the substantial equality of JBW and bookbinder machine operations are well supported. His equation of Smyth sewing machine operations with certain difficult bookbinder operations significantly underscores Mr. O'Connell's testimony. In sum, as to both machine and hand functions, Mr. Gottlieb's study and Mr. O'Connell's conclusions indicate that, at the very least, across-the-board separation of bookbinder and JBW operations is not justified.

3. *The defendant's evidence does not justify its separate classification of JBW and bookbinder positions.*

■ Defendant's sole expert witness on job evaluation was Irwin P. Lazarus, PhD. His overall finding was that JBW tasks required less skill, effort, and responsibility than bookbinder tasks. Dr. Lazarus' opinion has been considerably less valuable to the Court than Mr. Gottlieb's.

Preliminarily, Dr. Lazarus' experience between 1974 and 1977 was primarily administrative rather than as a substantive job evaluator. For the GPO study, he used a 12-point evaluation system developed by a team of evaluators at a private firm in 1961. Dr. Lazarus' had never used the plan before, and had not adapted it for use at the GPO bindery. He admitted that certain aspects of the plan were irrelevant to the tasks performed at GPO. Further, he acknowledged that the plan had been rejected on the ground of built-in sex bias by the Seattle office of the Equal Employment Opportunity Commission. In particular, the plan grants no points for physical effort for repetitive operations with light objects. Dr. Lazarus conceded that this element might well add points to evaluations of JBW jobs at GPO.

Dr. Lazarus' execution of the plan was flawed. Although he normally spends months on such a study, he reached his final conclusions on the basis of a two-day visit to the bindery. Rather than studying all 105 bindery operations, he evaluated a total of 36 hand and machine operations. He testified that he selected the operations to be studied on the basis of his work experience in a small bindery 20 years previously, and a 90-minute walk-through of the four-story GPO bindery operation. Dr. Lazarus' notes on his visit to the bindery indicate that he observed the various operations in an order which would have required him to go from one floor to another and back again several times in the course of his visit. It seems clear that he was escorted from machine to machine by defendant's employees, and that the suggestions of these employees significantly affected his initial choice of machines to be evaluated. Even if Dr. Lazarus' choice of machines were independent, this Court is not prepared to accept as representative a selection based on less than a minute spent observing each of 105 operations.

The method of Dr. Lazarus' study is also suspect. The defendant argues that this study is more objective, and therefore more reliable, than the plaintiffs' study because it evaluates each operation on the basis of 12 point-scored factors. However, only 5 of the 480 point assignments in the study contain any reason for Dr. Lazarus' assignment

of particular point values to any factor. His notes contain only 17 instances of reasons given for point scores assigned. On the witness stand, he could give no reasons for any particular point assignments. Rather than being objective, Dr. Lazarus' study seems based on numerous wholly subjective judgments.

The plaintiffs have shown various internal inconsistencies and mistaken assumptions, which indicate the unreliability of Dr. Lazarus' conclusions. For example, he concluded that a high school education was necessary to adjust the relatively simple two knife Round Cornering machines. However, Ralph Miller, a bookbinder, testified that this machine required no high school background and could be learned in one day. Furthermore, of 180 bookbinders hired from outside GPO, the application forms of at least 92 show that they did not complete high school. There is no minimum educational requirement for entry into the bindery apprenticeship program. Although Dr. Lazarus purported to base his assessment of the time required to learn an operation on the judgment of supervisors, he recorded no notes of interviews with supervisors and could not recall conversations with any of them.

Dr. Lazarus gave 48 points for physical effort on the Sheridan upright smashing machine for "continuous heavy work", defined as continuous work lifting objects weighing an average of 16 to 25 pounds. He based this conclusion on the 15 to 18 pound weight of an uncovered book on the machine at the time of his visit, although this seems unusually heavy for an unbound book. Dr. Lazarus had no knowledge whether this weight was within the normal range for books bound at GPO. Smyth operators are required to sew all books, which are subsequently "smashed", and to lift these books to a conveyor after they are sewn. Although it is clear that this must require equivalent effort, Dr. Lazarus gave Smyth operators only 12 points for effort. Similarly, he awarded 30 points for handling of confidential data to the bookbinder who sets up and adjusts the Moffet automatic sewer in the passport area and handles numbered passports. However, he gave no points for confidentiality to JBW assistants on this machine, who would necessarily handle whatever the bookbinder handles.

In several instances, Dr. Lazarus seriously underestimated the experience and skill factors in JBW work. He awarded no points for training or experience in hand sewing and looked at only one of many types of hand sewing. He stated that no points were given for hand sewing experience because the sewing was of the variety most women knew how to perform. One reason given for Dr. Lazarus' low rating of the Smyth with automatic feed was his understanding that grade 4 JBWs could learn to operate it in one week. However, Ms. Thompson testified that individuals with experience on non-automatic Smyth machines required four to five weeks of training to become proficient on the automatic-feed Smyth. Finally, at the time of trial, Dr. Lazarus was unaware of the two-year JBW training requirement, and the additional training required for sewing machine operators.

The defendant also presented the statistical analysis of Clyde Meade, defendant's Chief of Quality Control, based on a combination of Dr. Lazarus' study and the 1977 statistics concerning bookbinder functions. Mr. Meade acknowledged that his analysis was dependent upon the selection of a representative cross-section of bookbinder duties by Dr. Lazarus, and reliable assignment of point scores by him. He expressed no opinion as to the validity of Dr. Lazarus' sample or his point scores. Due to this heavy reliance on the questionable Lazarus study, Mr. Meade's evaluation is of little use to the Court. In sum, neither the Lazarus study nor the Meade study, based upon it, impair the Court's reliance on the plaintiffs' expert testimony in assessing the legitimacy of the GPO job classification system.

C. *The Relevant Comparison is Between the Primary Functions of Bookbinders and JBWs.*

Subsequent to the administrative proceeding in this case, the defendant adopted

the position that the separate classification of bookbinders, as well as the four-year bookbinder apprenticeship, were justified because bookbinders in fact rotate from job to job in the craft range of tasks. However, the evidence before this Court clearly establishes that no such rotation is a part of the bookbinder function. In fact, bookbinders appear to perform only minimal duties in addition to their primary tasks. Those additional duties that are performed often require only minimal skills.

On November 16, 1973, Mr. Kingsbury stated under oath for purposes of the administrative investigation:

> In regard to the stability of bookbinder assignments it should be noted that those assigned to Folding Machines, Gathering Machines and Inserters are removed from these machines only in rare cases of emergency. I would estimate that between 75% and 80% of our Bookbinders perform on the same piece of equipment day in and day out through their regular tour of duty. The rest of the Bookbinders are working on less complicated pieces of equipment or performing the other Bookbinder duties such as the Hand Forwarding and Finishing Operations necessary to bind or rebind library books in the library section; and the processing of United States Passports. . . .

Plaintiffs' Exhibit 1 (Investigation Report, Exhibit 12, pp. 6–7). As a hostile witness for plaintiffs at the trial in March, 1979, he admitted the truth of this statement. In addition, he acknowledged that he had signed a statement on February 15, 1979, which reiterated his 1973 statement: "I would estimate that as of 1973 that between 75% and 80% of all Bookbinders performed on the same piece of major equipment day in and day out through their regular tour of duty, that is, as long as they remained in the same section." Plaintiffs' Exhibit No. 39. Mr. Kingsbury's conclusion was confirmed by Mr. Hammill at the time of the administrative investigation.

Mr. O'Connell testified in 1973, 1978, and 1979, that, because of production line specialization, job rotation of bookbinders was not a significant feature of the Binding Division. He testified that many bookbinder operators operate a single machine 100% of the time or operate one machine at least 90% of the time as a primary assignment and fill in on similar or identical machines when necessary.

At trial, the defendant attempted to establish that bookbinders did rotate among various machine operations by introducing statistics for the period January 1, 1977, through September 30, 1977, to show the assignment of bookbinders to different jobs within the bindery. However, these statistics are not helpful in determining the extent of bookbinder rotation in 1973. Several witnesses, including Mr. Kingsbury and Charles Enterline, Assistant Superintendent of the Bindery from 1974 to present, testified that bookbinders still had primary assignments in 1977 and 1978, but spent less time on primary assignments in these years than they did in 1973. This reduction in percentage of time spent on primary tasks was attributed to increased contracting out of work and reduction in the bookbinder work force. The 1977 and 1978 statistics establish that, for those years, bookbinder major machine operators spent between 80% and 100% of their time on the same machine, and left that machine only when it was not running, and only to operate simple machines or perform simple hand tasks. Since the defendant gave no reason why such statistics were not offered for the year 1973, the Court can only conclude that they would have established that bookbinder rotation was even less significant at that time.

The conclusion that only minimal rotation among jobs is actually required of bookbinders is underscored by the uncontroverted testimony of several bookbinders. Mr. John Sessa testified that he had been assigned to the flat bed cutter almost exclusively since 1949, except for intermittent assignments to simple tasks in the Passport Cage. He further testified that the statistics attributed tasks to him which he is not capable of performing and has never performed. Paul Hiser, a GPO apprenticeship graduate of

1964, testified that he had worked almost exclusively on the board cutting machine since 1965. The 1977 and 1978 statistics show that 99.1% of his time during this period was spent on this machine. He testified that his assignments away from the board cutter during this period were greater than in 1973. Ralph Miller testified that his job for the last 12 years has been the setting up and adjustment of five or six drills operated by PPWs, and that he has no other duties. The 1977 statistics show that he spent all of his time on the drills. The 1978 statistics show 447 of 466 hours spent on the drills. Mr. Miller testified that other assignments in 1978 reflected voluntary overtime.

Several JBWs who had worked in the bindery for a number of years gave unrebutted testimony as to specific bookbinders, with whom they had worked closely and constantly, and who performed only their primary tasks for extended periods. One such JBW, Joanne Duckett, has been assigned to the passport area for many years. She testified that seven named bookbinders who had been assigned to the passport area for periods from three to ten years generally leave in alphabetical order when no work is needed on passports. They generally go to Pad Alley, where only very simple hand work (smearing glue on pads) is performed. Such assignments appear to be typical alternatives to bookbinder's primary duties.

In sum, except for the 29 bookbinders assigned to the hand bindery and a few individual bookbinders who performed back-up work or worked on various small machines, there was no significant rotation of bookbinders among various machine jobs in 1973. It was not an integral part of the bookbinder's job to perform a variety of functions. Some bookbinders were in fact incapable of performing any jobs other than their primary one. Although some additional rotation among bookbinder functions occurred in 1973, at least 50% of the bookbinders continued to spend more than 80% of their time on their primary duties. Finally, in many cases of bookbinders whose time away from their primary duties increased during the period from 1973 to 1978, on-the-job training was required and received. Such training has at no time been made available to JBWs. Therefore, for purposes of comparison of JBW and bookbinder positions, the relevant evaluation is of primary tasks to which individual employees are assigned. Neither the four-year apprenticeship nor the separate classification of JBWs and bookbinders can be justified on the basis of any supposed bookbinder rotation.

D. *The Separate Classification of Craft and Non-craft Jobs, Combined with the GPO Apprenticeship System, Make Advancement Within the GPO Bindery Virtually Impossible for Female JBWs.*

JBWs are required to undergo a two-year apprenticeship program at the GPO Bindery, in addition to special six-month to one-year training periods for sewing machine operators. Although bookbinders are given the opportunity to undertake substantial additional training after the completion of their apprenticeships, no such training is available to JBWs. Bookbinders need not train for jobs they prefer not to perform; JBWs, however, are required to accept assignments to jobs at all JBW levels, including those below their current levels. No GPO affirmative action plans contain provisions for upward mobility of JBWs.

Manning practices within the bindery allow movement from JBW positions to bookbinder positions only upon completion of the four-year bookbinder apprenticeship. Absent the apprenticeship, lower-level JBWs may only advance to the higher level JBW positions. Grade 4 and 5 JBWs have virtually no advancement opportunities.

Bookbinder status in the GPO has been especially difficult for women, including JBWs, to attain. Equivalent experience outside GPO—the second method for attainment of craft status—has been virtually unobtainable for women due to industry practices. Therefore, the GPO apprenticeship has been the sole method by which women could hope to become bookbinders.

The last GPO apprenticeship class entered the program in 1974. Prior to the termination of the apprenticeship program, competition for entry was very stiff. For example, 116 GPO employees applied for 14 positions in the January, 1972 class. Serious disincentives would exist for JBWs considering apprenticeship. First, JBWs would be required to take substantial pay cuts to become apprentices. Although other employees, such as PPWs entering the apprenticeship might have to take similar cuts, these employees have had no prior training. JBWs, as already indicated, undergo two to three-year training programs. They are given no credit for this training toward the bookbinder apprenticeship. Some current and former JBWs testified that they already knew how to set up and adjust certain bookbinder machines when they entered the GPO. Furthermore, many JBW tasks are so closely related to bookbinder tasks as to necessarily constitute valuable experience for bookbinder work.

No female bookbinder has ever remained at GPO. The evidence as to experiences of individual women within the bindery illustrates the difficulty of advancing across the sex and craft barrier. For example, defendant's witness Charles Enterline, Assistant Superintendent of the bindery from 1974 to the present, testified that a female bookbinder assigned to the bindery in the early 1960's had remained only a short time. Plaintiff Thompson testified that her immediate supervisor, bookbinder John Malanka had bragged, "We bookbinders got rid of her." Apparently, the female bookbinder had been assigned to a machine with which she was unfamiliar and other bookbinders had refused to aid her.

Mary Lovely, a female apprentice initially assigned to the bindery in 1971, was reassigned out of it almost immediately. Although defendant's employees testified that her assignment to the bindery had been the result of a typing error, Ms. Lovely testified that she had been approached daily by bookbinders who told her that the bindery was no place for a woman. She testified that she was happy to be reassigned, because the bindery was not her initial choice and she felt that she was treated badly there.

Selma Dillard, a former JBW who became a GPO apprentice in composing in 1972, testified that she had had considerable difficulty attempting to advance in the bindery. Ms. Dillard's initial entry into the apprenticeship program was blocked by an unfavorable supervisor evaluation. She testified that this experience was shared by many JBWs who applied for the apprenticeship program. She knew of GPO employees who had chosen to compete for the GPO apprenticeship on a nationwide basis through the Civil Service Commission in order to avoid potentially arbitrary supervisory evaluations. Ms. Dillard testified that she was ultimately accepted into the apprenticeship program only after her protestations concerning her evaluation resulted in its modification by the Bindery Superintendent.

The testimony of the only women apprentice assigned to the bindery in 1973, Anne Mackay, further indicates the obstacles confronted by women in the bindery. Ms. Mackay testified that, prior to her assignment, she had been under the impression that bindery apprenticeships were not open to women. Defendant's employee in charge of bindery apprenticeships beginning in 1975 testified on cross-examination that pranks, the like of which had never been played on males, had been played on Ms. Mackay. Ms. Mackay testified that she disliked the bindery because of "loneliness and lack of cooperation," and the bookbinder's lack of knowledge about how to treat her because she was a woman. In fact, it appeared to the Court that her testimony, indicating that she did not feel discriminated against, may have been motivated by her desire to advance herself within the bindery.

The testimony of defendant's Assistant Director of Personnel at GPO, Edward A. Blatt, evidenced a more egregious unawareness of the problem women encountered in the bindery. Although actual female representation in the GPO apprenticeship pro-

gram from 1972 to 1975 was 14%, he testified that females represented 30% of the apprentices. He also testified that there had been no female applications for apprenticeships from outside GPO. However, at least 13 of the 14 female apprentices from 1968 to 1972 came from outside GPO. He testified that bookbinders were frequently hired from outside GPO, but was unaware that the Constitution of the International Brotherhood of Bookbinders effectively prevented women from becoming bookbinders. Although he was aware that the procedure whereby GPO employees become apprentices depended largely upon admittedly subjective supervisor evaluations, he ascribed no importance to the fact that all such evaluations in the bindery are carried out by males. Mr. Blatt was unaware that all 17 GPO employees trained as bookbinders in the GPO upward mobility program were men. Although he admitted that he had never discussed the subject with a JBW, he expressed the view that women were unlikely to be attracted to Bindery Division apprenticeships because the bindery was noisy and dirty.

In sum, the Court finds there is little opportunity for advancement for female JBWs within the GPO bindery. Rather than providing female JBWs with such opportunities, the bindery apprenticeship program has been a virtually unobtainable goal. When obtainable, its conditions have made it particularly undesirable for women. Thus, the apprenticeship program and the GPO classification system operate together to effectively eliminate any advancement opportunities for female JBWs within the GPO bindery.

E. *The Actual Qualifications of GPO Bookbinders Highlight the Unfairness of the Four-Year Apprenticeship Requirement for JBWs.*

Applicants from private industry who seek to enter the GPO as bookbinders must be qualified to operate at least one piece of bindery equipment in addition to a gathering or folding machine. Prior to 1969, the requirement was two additional pieces of equipment. However, the evidence establishes that information on the application forms of males who entered the GPO with bookbinder status was false, and that the defendant failed to check the accuracy of information contained in such forms. For example, Franklin Shanks, a former bookbinder and now an assistant foreman, admitted that although his form indicated that he had been a bookbinder at a private press from 1957 through 1963, he had only been a helper during that period. Similar evidence of actual experience at very low levels in other bookbinding establishments involved bookbinder Maynard Tedder and Charles Crawford, a former bookbinder who is now Personnel Development Specialist in charge of the GPO apprenticeship program. The positions occupied included such duties as sweeping and stock boy work, which both require less skill than most JBW jobs.

Furthermore, many bookbinder application forms indicate little apprenticeship-type training. Of 180 application forms admitted into evidence by plaintiffs, only 61 contain any reference to an apprenticeship in binding. In some cases, this reference is only to a commencement of an apprenticeship, or an apprenticeship of less than four years. In addition, at least 25 application forms of current and former GPO bookbinders indicate that the individuals in question did not meet the stated minimum experience requirements for GPO employment.

Moreover, the evidence shows that many individuals hired as bookbinders from outside GPO were actually employed by GPO on tasks not listed on their application forms, for which they were apparently unqualified at the time of their entry. Obviously, these individuals benefited from the extensive on-the-job training made available to bookbinders at GPO.

Bookbinders received approximately 8,900 hours of on-the-job instruction on other bookbinder operations during the period of 1977 and 1978 for which statistics are before the Court. This represents the equivalent of full-time instruction for four or more bookbinders during this period. In contrast, JBWs are given virtually no train-

ing in addition to their required two-year apprenticeships and machine training periods. The evidence concerning the length of time required to learn operation of certain bookbinder machines indicates that JBWs could usefully acquire bookbinder skills if equivalent training was made available to them. For example, John Sessa testified that he has worked exclusively on the flat cutter for thirty years, although he had no previous experience on the cutter. This assignment commenced after only two months of on-the-job training on the cutter. Furthermore, defendant's expert, Dr. Lazarus, admitted on cross-examination that any bookbinder machine operation at the bindery could be learned in on-the-job training of six months or less. Bookbinder Ralph Miller testified that many bookbinder machine operations could be learned by anyone in a matter of days or hours.

In sum, the Court finds that the bookbinder's qualifications and their lack of work experience equivalent to the GPO apprenticeship, indicate that the apprenticeship or four-year experience requirement is not taken seriously for male bookbinder applicants from private industry. This group represents a large proportion of the GPO bookbinder staff. It seems apparent to the Court that experienced JBWs could benefit from the training which has been given exclusively to bookbinders.

## II. CONCLUSIONS OF LAW.

This Court has jurisdiction over this case under Title VII of the Civil Rights Act of 1964, as amended, and under the Equal Pay Act of 1963, as amended. As a unit of the legislative branch having positions in the competitive service, the defendant is subject to the Title VII prohibition against discrimination by an employer against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex," as well as the prohibition against employee classification in any manner which would tend to deprive any individual of "employment opportunities or otherwise adversely affect his status as an employee" on the basis of sex. 42 U.S.C. § 2000e–2(a). It is also subject to the Equal Pay Act provisions of the Fair Labor Standards Act, 29 U.S.C. 206(d), which prohibit an employer from paying wages to employees at a rate less than that paid to employees of the opposite sex for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions.

### A. Title VII Claims.

■ Pursuant to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), proof of employment discrimination under Title VII is subject to a shifting burden of proof. The plaintiff must first establish a prima facie case of discrimination, which the defendant may then attempt to refute. In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court specifically applied the general *McDonnell Douglas* allocation of proof to sex discrimination cases. Although *McDonnell Douglas* established a basic four-part test for the establishment of a prima facie case of discrimination in individual cases, the Court made it clear that proving prima facie employment discrimination could not be restricted to one method. 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13.

*Teamsters* expressly approved the use of statistics as a way of proving a prima facie case of employment discrimination: "We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases . . . [citations omitted]. Statistics are equally competent in proving employment discrimination [footnote omitted] . . ." 431 U.S. at 339, 97 S.Ct. at 1856. The Court further states:

> Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result

in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that general population thus may be significant even though § 703(j) makes clear that Title VII imposes no requirement that a work force mirror the general population.

*Id.* at 339 n.20, 97 S.Ct. at 1857 n.20. In this case, statistical evidence shows gross and long-lasting disparities; thus creating a strong inference of such discrimination. The bare fact that in 1973, all but one of 325 JBWs were female and all 279 craft bookbinders were male, and in 1978, one of approximately 250 bookbinders was female, strongly supports such an inference. As in *Teamsters*, the testimony of individual class members as to specific instances of discrimination "brought the cold numbers convincingly to life." 431 U.S. at 339, 97 S.Ct. at 1856.

Plaintiffs' evidence concerning the separate classification of bookbinder and JBW positions, and the application of a four-year apprenticeship requirement to experienced JBWs proves clearly that both of these management practices are relics of pre-Title VII discriminatory practices. The plaintiffs have clearly shown that bookbinder and JBW jobs are so similar in content and working conditions as to make the across-the-board separate classification, and the denial of bookbinder apprenticeship credit for JBW experience unreasonable as a matter of business management. This conclusion is reinforced by the evidence concerning the actual skills used and tasks performed by non-Library Section bookbinders.

The separate craft and non-craft JBW and bookbinder job classification system, as well as the four-year apprenticeship requirement for experienced JBWs to enter the craft system—both of which are preserved unaltered from the period before Title VII became applicable to GPO in 1972 —serve to perpetuate the effects of past discrimination. As such, without justifica-

tion on the basis of business necessity, these practices constitute continuing violations of Title VII. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), rules that mere evidence of pre-Title VII discrimination does not constitute a violation of the law so long as all post-enactment decisions are made in a non-discriminatory fashion. This rule is inapplicable here because defendant has failed to show any business necessity for its management practices which perpetuate the discrimination between sexes and inequality of opportunity.

The defendant argues that the plaintiffs have failed to make a prima facie case under the *McDonnell Douglas* and *Teamsters* formulation, because none of the plaintiffs have applied for the apprenticeship program since 1972. The basic four-part prima facie case established in *McDonnell Douglas* does indeed include the requirement that the plaintiff show that he has applied and been rejected for the desired position. However, no such requirement is relevant here. It has been found that the apprenticeship program is used to perpetuate existing separation on the basis of sex, and the four-year requirement is superfluous for performance of bookbinder tasks. It would be unreasonable to require the plaintiffs to apply for a program which violates their Title VII rights in order to gain standing to enforce those rights. It is sufficient that the plaintiffs showed the serious disincentives to their entry into the program. In addition, the system of access to the apprenticeship program through exclusively male supervisor evaluations appears to be a "ready mechanism for discrimination" in access to the apprenticeship program. *See Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972). Under such circumstances, no proof of application for the program is necessary. As the Court stated in *Teamsters, supra* 431 U.S. at 367, 97 S.Ct. at 1870: "[A] nonapplicant can be a victim of unlawful discrimination . . . when an application would have been a useless act serving only to confirm a dis-

**1162**

criminatee's knowledge that the job he wanted was unavailable to him."

The defendant attempts to discredit plaintiffs' statistical evidence. It acknowledges that since 1967, only 52 of the 430 persons accepted into the GPO program have been women. However, it argues that this statistic cannot be relied upon to show unequal access to the apprenticeship program, because the plaintiffs failed to present evidence concerning the pool of available workers for the program. It relies in particular upon the caution of *Hazelwood, supra,* that statistical evidence is relevant to show employment discrimination only by reference to the appropriate pool of available workers. However, the defendant's argument is simply inapplicable to this case. *Hazelwood* involved a pool of highly skilled workers [schoolteachers] in a discrete geographical area. The delineation of the relevant geographical area to which the defendant could be expected to look for applicants was in dispute, and the determination of the appropriate area made an enormous difference in terms of the number of available candidates. The Court in *Hazelwood* expressly distinguished the *Teamsters* situation:

> In Teamsters, the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was highly probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the small group of individuals who possess the necessary qualification) may have little probative value."

433 U.S. at 308 n.13, 97 S.Ct. at 2742 n.13. Here, as in *Teamsters,* no special qualifications are required to join the apprenticeship program. The defendant has offered no evidence that special qualifications were necessary, nor any other explanation for the ratio of men to women in the apprenticeship program. While the ratio could be expected to approach 50%, 52 of 430 apprentices amounts to only 12%. This amounts to about 15.7 standard deviations. In *Castaneda v. Partida,* 430 U.S. 482, 497 n.17, 97 S.Ct. 1272, 1281 n.17, 51 L.Ed.2d 498 (1977), the Court suggested that 2.0 or 3.0 standard deviations from the expected proportion might be considered significant. *See also Hazelwood, supra,* 433 U.S. at 308–9 n.14, 97 S.Ct. at 2741–42 n.14.

In sum, the plaintiffs have established a prima facie case of disparate impact and disparate treatment through statistical evidence of the ratio of men to women in bookbinder positions and apprenticeships, and comparison of their ratios with the percentage of females in the population. The disparities here are so great as to warrant such a finding on the statistics alone. These statistics must be evaluated in light of the intentionally discriminatory practices prevalent in the industry as a whole and in the GPO bindery until recently—the persistent exclusion of women from supervisory positions, the lingering inadequacy of opportunities for advancement available to JBWs, the serious disincentives to JBW attempts at advancement, and the inherent difficulty of upward movement in a hostile atmosphere. *See James v. Stockham Valves and Fittings Co.,* 559 F.2d 310, 328–9 (5th Cir. 1977) *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 225–34 (5th Cir. 1974).

Defendant relies on *Teamsters, supra,* to argue that the current disparity is the result of a "bona fide" apprenticeship system, which it maintains is the equivalent of the seniority system found to be bona fide in that case, and therefore expressly exempted from the Act by § 703(h) of Title VII, 42 U.S.C. 2000e–2(h). It argues that, because it is the result of a pre-existing "bona-fide" system, the apprenticeship program cannot be invalidated under *Griggs, supra.* However, the *Teamsters* decision made it clear that the system there was exempted only by the express exception for seniority systems within the Act. The GPO apprenticeship is clearly outside that express exception, because it is unrelated to seniority.

The *Teamsters* Court explained the *Griggs* prohibition and reaffirmed its validity apart from the seniority exception:

One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination. As the Court held in *Griggs, supra* : "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 430, 91 S.Ct. at 853.

Were it not for § 703(h), the seniority system in this case would seem to fall under the *Griggs* rationale . . . 431 U.S. at 349, 97 S.Ct. at 1861–1862.

Furthermore, unlike the seniority system in *Teamsters*, the personnel classification system in the bookbinding craft originated with discriminatory practices and could not, in any case, be considered bona fide.

The defendant urges this Court to adopt the lesser test for justification of employment decisions which was recently stated in *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). This test would require it only to "articulate some legitimate, nondiscriminatory reason" for its employment decisions. However, that test is inappropriate where, as here, the discrimination alleged is inherent in the basic structure of the defendant organization. Furthermore, neither the apprenticeship program nor the four-year apprenticeship requirement for JBWs would pass muster even under this liberal test. The evidence overwhelmingly indicated that, with the exception of hand Library Section bookbinders, few bookbinders regularly used the skills acquired in their apprenticeships. The evidence also indicated that the equation of at least some of the JBW positions [JBW 4s] with various bookbinder jobs is more appropriate than the equation of certain bookbinder positions with one another. Thus, it seems clear that the apprenticeship requirement is unnecessary and the classification system is arbitrary.

The defendant's only attempt to articulate a legitimate explanation for either the apprenticeship or the classification system was through a theory that bookbinders needed skills acquired through the apprenticeship to rotate from one bookbinder position to another within the bindery. However, the facts clearly establish that bookbinders rarely perform more than one job. The evidence also indicates that few bookbinder operations require more than a few months training. Furthermore, Ammi Potter, Superintendent of the bindery from March 1, 1977, to the present, testified that GPO had never evaluated whether the bindery could operate with bookbinders who could operate only one piece of equipment, although he knew that this was the practice at other establishments. No explanation has been offered as to why such an alternative has not been considered in a context where the apprenticeship system so clearly operates to the detriment of females in the bindery.

The apprenticeship and job classification system are similarly unjustified under the ordinary business necessity standard. The system seems to fit clearly within the *Griggs* prohibition against a system neutral on its face, which operates to extend the effect of past discrimination: "When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield unless there is an overriding, legitimate nonracial business purpose." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158 (1971). This standard has been held to connote an "irresistable necessity." *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) (*Pettway II*).

In this case, as in *Pettway*, there is little support for the four-year apprenticeship in the record. Instead of attempting to defend the program, the defendant concentrates on the argument that, so long as it did not discriminate in apprenticeship selec-

tions between 1972 and 1974, plaintiffs are entitled to no relief. Rather, it appears that the defendant continues to use the apprenticeship requirement, and the convenient extinction of the apprenticeship program, to prevent the advancement of JBWs. The hiring of bookbinders from private industry with less directly related experience to their tasks at the GPO than that of GPO JBWs to bookbinder tasks, the on-the-job training of bookbinders, and the specialization of bookbinders tasks all indicate that the four-year apprenticeship or "equivalent experience" requirement cannot be adequately justified on the basis of business necessity.

In an earlier decision in the *Pettway* litigation, the 5th Circuit rejected the defendant's attempt to justify its apprenticeship program as a business necessity. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 250 (5th Cir. 1974) (*Pettway I*). The court held that, given the exclusion of black employees, the three or four-year apprenticeship and seven-year journeyman requirements were too long. The court required the defendant to shorten these periods to permit only training realistically required for craft-related jobs. Alternatives suggested by the court included the training of employees to operate particular machines rather than undergoing the full apprenticeship, and to broaden the qualifying experience to include comparable experience on jobs *outside* craft departments. This would be analogous to crediting JBWs with experience in the bindery for purposes of attainment of craft status. In addition, the *Pettway II* court pointed out that the trial court should examine for adverse impact the use of *subjective* selection criteria in the journeyman program. As in the *Pettway* decisions, there appear to be obvious acceptable alternatives open to the defendant, which it has failed to explore despite the clear adverse impact of its organization on females in the bindery.

Defendant attempts to justify the lack of even a single woman supervisor on the ground that craft status is, by its rules, a prerequisite to becoming a supervisor. However, it seems plain that, if women have been barred from obtaining craft status through the defendant's unlawful apprenticeship and craft-non-craft division, it may not rely on the lack of bookbinder status to prevent otherwise qualified JBWs from becoming supervisors. *See James v. Stockholm Valve, supra*; *Pettway II, supra.* Furthermore, the defendant has failed to offer any proof that craft status is functionally related to the supervisor position. As with the separate classification and apprenticeship systems, the defendant has failed to establish a business necessity for the supervisor craft requirement. Therefore, the Court finds that the defendant's rule that only craftsmen may compete for supervisory and printing specialist positions constitutes a pattern and practice of sexual discrimination in violation of Title VII.

Defendant finally attempts to argue that the plaintiffs are entitled to no relief since the apprenticeship program and craft requirements are applied to men as well as women. However, the defendant still fails to counter the evidence of unequal operation of the program with regard to men and women. Men may acquire alternative bookbinder skills outside GPO, which is unavailable to women because of industry-wide discrimination; female JBWs are in a position in which disincentives to joining an apprenticeship program are greater. This argument is merely an unpersuasive attempt to circumvent the business necessity requirement or the requirement to justify a system which is facially neutral but discriminatory in impact.

In sum, the plaintiffs have overwhelmingly established that the GPO separate classification system for bookbinder and JBW jobs operates to perpetuate the effects of past discrimination and is not justified for business purposes or for any other reason. Plaintiffs have established with equal certainty that the four-year apprenticeship requirement is excessive as applied to GPO JBWs, and serves to exaggerate the undesirable effects of the existing female JBW-male bookbinder job classification system. In accordance with the fore-

going, the Court finds that the defendant's requirement that JBWs complete a four-year apprenticeship program before attaining craft bookbinder status, and defendant's classification of all JBW positions as noncraft positions, with lesser pay and advancement opportunities than that available to craft employees, each constitute a pattern and practice of sexual discrimination violative of Title VII of the Civil Rights Act. Whether or not they have applied for apprenticeship or supervisory positions, female JBWs within the bindery are entitled to class-wide relief to remedy these abuses.

B. *The Equal Pay Act Claims.*

The initial burden of proof in Equal Pay Act cases is upon the claimant-plaintiff. As the Court of Appeals for this circuit states in *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 448 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978):

> An Equal Pay Act claimant must show that her salary was lower than that paid by the employer to "employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions." [29 U.S.C. 206(d)(1) (1976).] The claimant bears the onus of demonstrating the work unequally recompensed was equal within the meaning of the Act.

The legislative history of the Act reveals that Congress specifically substituted "equal work" for "comparable work" as the operative standard. *See Orr v. Frank R. MacNeill & Sons, Inc.*, 511 F.2d 166, 171 (5th Cir. 1975). Thus, mere comparability of jobs will not suffice for purposes of the application of the Equal Pay Act. *Brennan v. City Stores*, 479 F.2d 235 (5th Cir. 1973).

While "equal work" does not mean that the jobs must be absolutely identical, *see Corning Glass Works v. Brennan*, 417 U.S. 188, 203 n.24, 94 S.Ct. 2223, 2232 n.24, 41 L.Ed.2d 1 (1974), it is clear that the compared jobs must be "substantially equal."

*See Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3rd Cir. 1970), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).

The term "substantially equal work" has been held to mean that the jobs at issue must have "a substantial identity of job functions," *Hodgson v. Golden Isle Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (1970). Furthermore, courts stress that job content, rather than job descriptions, or titles given by an employer, is the controlling factor under the Equal Pay Act. *See, e. g., Hodgson v. Brookhaven General Hospital*, 436 F.2d 719, 724 (5th Cir. 1970) ["The controlling factor under the Equal Pay Act is job content—the actual duties that the respective employees are called upon to perform. Job descriptions . . . may or may not fully describe job content. *Cf.* 29 C.F.R. § 800, 121 (1970)."]. Only the primary duties on each job are compared, and duties which are insubstantial and incidental to the performance of each worker's primary function are ignored in the job comparison. *Shultz v. American Can Co.*, 424 F.2d 356, 360–61 (8th Cir. 1970).

The Third Circuit, in *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1173 (3rd Cir. 1977), further refined the analysis required for a determination of the "equal work" issue. It ruled, "The Equal Pay Act comprehends a threshold requirement, evident in the legislative history and confirmed in the case law, that the *jobs* to be equated be substantially the same. The requirement of equality of job content inheres in the statutory term 'equal work'." [original emphasis]. Thus, the concept of equality under the Act embraces job content as a separate and additional element to comparability of skill, effort, responsibility, and working conditions. It should be noted, however, that the Act doesn't require that the job pairs be equal or that the particular pieces of machinery used in the job pairs be identical. The Department of Labor has promulgated an extensive series of regulations, 29 C.F.R. §§ 800.114–800.166 (1978), to guide the "application of the equal pay standards, [which] is not dependent on job classifications or titles but depends rather

on actual job requirements and performance . . . ." 29 C.F.R. § 800.121 (1978). One regulation states:

Congress did not intend that inconsequential differences in job content would be a valid excuse for payment of a lower wage to an employee of one sex than to an employee of the opposite sex if the two are performing equal work on essentially the same job in the same establishment.

19 C.F.R. § 800.120 (1978). Another regulation points out:

The performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply. If the difference in skill or effort required for the operation of such equipment is inconsequential, payment of a higher wage rate to employees of one sex because of a difference in machines or equipment would constitute a prohibited wage rate differential . . . ."

See 19 C.F.R. § 800.123 (1978). These regulations are entitled to great deference by the courts in applying the Equal Pay Act to govern factual situations. *Laffey v. Northwest Airlines, Inc., supra,* at 449.

Turning to the evidence presented by the parties, the Court finds that Mr. O'Connell's testimony is sufficient to satisfy the threshold requirement, established in *Angelo,* that the jobs to be equated (in terms of skill, effort, responsibility, and working conditions) are substantially the same in job content. However, the Court declines to extend this finding to jobs of JBWs of grades other than grade 4. While Mr. O'Connell's testimony that the Smyth sewing machine operation (performed only by grade 4 JBWs) was more closely related to many of the bookbinder operations than certain bookbinder operations were to one another unequivocally supports a threshold determination that the two jobs subsequently equated are substantially the same, there is no equivalent testimony to support a similar finding in regard to jobs of JBWs other

than grade 4. Mr. O'Connell's study was limited to the operation of the Smyth sewing machine; Mr. Gottlieb's conclusions only reach the issue of whether the job functions of JBWs and bookbinders are equal in skill, effort, responsibility and working conditions. Thus, the plaintiffs have failed to satisfy their burden of proof, under the Equal Pay Act, as to JBWs other than grade 4.

The Court finds further that jobs of individual plaintiffs at the grade 4 JBW level and jobs of individual bookbinders are substantially equal in skill, effort, responsibility and working conditions. Defendant has presented no credible evidence on the skill, effort, responsibility and working conditions of the jobs in issue. The testimony of its expert witness cannot be credited for the many reasons set forth in the Court's findings of fact. Both Mr. O'Connell and Mr. Gottlieb found that operation of the Smyth sewing machine is "substantially equal" to the operation of the major bookbinder machines in these areas. In reaching this conclusion, the Court has reviewed all the evidence and analyzed the job content of the respective jobs; that is, the tasks performed therein.

Since plaintiffs have demonstrated that the individual jobs performed by female grade 4 JBWs are substantially equal, in job content, skill, effort, responsibility and working conditions to individual jobs performed by higher paid male bookbinders, defendant has the burden of proving that the wage differential is justified under one of the Equal Pay Act four exceptions: (a) a seniority system; (b) a merit system; (c) a system which measures wages by quantity or quality of production; or (d) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1) (1976). Defendant has not met its burden on this issue. Its only defense is that the bookbinder's job involves a four-year apprenticeship requirement in the form of a training program that has traditionally excluded women. The program has not been completed by the majority of bookbinders and is unnecessary to the performance of individual bookbinder jobs.

■ In sum, the Court finds that the defendant has violated the Equal Pay Act, 29 U.S.C. § 206(d)(1) (1976), by paying higher wages to male bookbinders than to female grade 4 JBWs for equal work on jobs the performance of which requires equal skill, effort, responsibility and which are performed under similar working conditions. Under the standards established in *Laffey v. Northwest Airlines, supra* at 459–66, defendant's violations of the Equal Pay Act are willful. As a result of the unsuccessful attempts, made by grade 4 JBWs, from 1963 to 1973, to have their positions reclassified, defendant was fully aware of the Equal Pay Act and adopted a deliberate and knowing course of conduct despite this awareness. The judgment of defendant that its conduct would not be found to be in violation of the Equal Pay Act has been found to be in error. The conduct of defendant in the exercise of that judgment was willful.

### III. CONCLUSION.

In accordance with the foregoing, the Court finds that the defendant has violated (1) Title VII of the Civil Rights Act of 1964, as amended, as to the entire class of plaintiffs, and (2) the Equal Pay Act of 1963, as amended, as to grade 4 JBWs. The appropriate injunctive and other relief to which the individual class plaintiffs are entitled, as a result of the Court's findings of fact and conclusions of law, will be determined in a subsequent proceeding.

### ON ISSUE OF RELIEF

#### I. *Introduction*

This case is before the Court on the issue of relief. On October 1, 1979, the Court issued Findings of Fact and Conclusions of Law in this sex discrimination suit ("opinion"). The specific findings and conclusions of the October 1 opinion are:

1. The across-the-board separate classification of male Bookbinders and female Journeyman Bindery Workers ("JBWs") is a pattern and practice of discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1976);

2. The defendant's requirement that JBWs complete a four-year apprenticeship program before attaining Bookbinder status is a pattern and practice of discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964;

3. The defendant's rule that only craftsmen may compete for supervisory and Printing Specialist positions constitutes a pattern and practice of discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964; and

4. Defendant willfully violated the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d) (1976), by paying higher wages to male Bookbinders than to female grade 4 JBWs for equal work on jobs the performance of which requires equal skill, effort, responsibility and which are performed under similar working conditions.

The Court must now determine the appropriate relief to which the plaintiff class is entitled. Accordingly, pursuant to Federal Rule of Civil Procedure 52(a), the following supplements the Court's findings of fact and conclusions of law of October 1, 1979.

#### II. *Permanent Injunctive Relief*

Congress has granted courts plenary equitable powers under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(g) (1976), for constructing appropriate remedies for employment discrimination. Pursuant to the authorization, plaintiffs seek a permanent injunction restraining the defendant from discriminating against the class plaintiffs on the basis of sex in any aspect of employment. In addition, plaintiffs request a provision in the Court's remedial order enjoining defendant from retaliating against any member of the class because of participation in any manner in this litigation. Defendant opposes this proposed injunctive relief arguing that it is unnecessary because defendant intends to comply with the law and plaintiffs' rights are already protected by Title VII and regulations promulgated thereunder.

The broad injunctive relief requested by plaintiffs is clearly appropriate under the facts of this case. Although injunctive relief is within the discretion of the Court, absent clear and convincing proof of no probability of further noncompliance with the law, a grant of injunctive relief under Title VII is mandatory. *James v. Stockham Valves and Fitting Co.*, 559 F.2d 310, 354 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Here, the Court cannot discern clear and convincing proof of no probability of further noncompliance with the law.

Defendant's assertions regarding its future compliance with the law is plainly inadequate to preclude the injunctive relief sought. As the Fourth Circuit has observed: " '[P]rotestations or repentance and reform timed to anticipate or to blunt the force of a lawsuit offer insufficient assurance' that the practice sought to be enjoined will not be repeated." *Cypress v. Newport News General & Nonsectarian Hospital Ass'n*, 375 F.2d 648, 658 (4th Cir. 1967). *See also Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir. 1972). Absent an injunction, the defendant is unlikely to examine its overall employment practices and bring them into compliance with applicable law. Accordingly, the permanent injunctive relief sought by plaintiffs shall be granted.

### III. *Back Pay*

 Plaintiffs have requested the Court to award them back pay under the provisions of Title VII and the Equal Pay Act. Based upon the Court's findings and conclusions, it is clear that plaintiffs are entitled to relief in the form of back pay. However, there is substantial dispute between the parties as to the nature and scope of such an award under Title VII in this case.

### A. *Back Pay Under Title VII.*

In authorizing courts under Title VII to grant equitable relief to persons harmed by employment discrimination, Congress included the discretion to award back pay. *See* 42 U.S.C. § 2000e-5(g) (1976). The pro-

vision authorizing back pay included in Title VII was expressly modeled on the similar provision in the National Labor Relations Act, 29 U.S.C. § 160(c) (1976),[1] which is "designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice." *Nathanson v. NLRB*, 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952). Under Title VII, the injured workers must be restored to the economic position which they would have occupied *but for* the discrimination—their "rightful place." Thus, back pay is compensatory in nature and necessary in order to grant full relief in employment suits. *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 251–52 (5th Cir. 1974), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

Once a court has determined that a plaintiff or complaining class has sustained economic loss from a discriminatory employment practice, a presumption in favor of back pay arises, and any denial must be well supported. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 470 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). With these considerations in mind, the Court now focuses on the particular equities presented by the case at bar.

Defendant has maintained a job classification system whereby male Bookbinders are classified as "Craft" employees and female JBWs (all grades) are classified as "Non-craft" employees. For the reasons stated below, the Court found this separate classification system discriminatory in violation of Title VII of the Civil Rights Act of 1964. The Court's findings were based upon credible and persuasive evidence indicating the various JBW and Bookbinder positions are sufficiently similar in content and working conditions as to make "the across-the-board" separation of the Bookbinder and JBW operations unjustified. Opinion at 1154, 1159.

---

1. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

Defendant's requirement that JBWs complete a four-year apprenticeship before attaining the "Craft" classification or status was also found discriminatory in violation of Title VII. The apprenticeship was found to be virtually unobtainable for females and unnecessary to the function of the "Craft" employees. *Id.* at 1159, 1160. It was the Court's conclusion that the apprenticeship program and the GPO classification system operate together to effectively eliminate any advancement opportunities for female JBWs within the GPO Bindery. *Id.* at 1159. Furthermore, defendant's rule that only "Craftsmen" may compete for supervisory and Printing Specialist positions was found by the Court to be a pattern and practice of discrimination on the basis of sex in violation of Title VII. *Id.* at 1165. As can be seen, the opportunity for JBWs to advance within the GPO Bindery was effectively precluded by defendant's practices.

The Court's final finding was with respect to the plaintiffs' allegations under the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d)(1) (1976). On the basis of compelling evidence illustrating that jobs of individual plaintiffs at the grade 4 JBW level and jobs of individual Bookbinders are substantially equal in job content, skill, effort, responsibility and working conditions, the Court found that the defendant violated the Equal Pay Act by paying higher wages to male Bookbinders than to female grade 4 JBWs. *Id.* at 1167.

Plaintiffs now contend the Court's finding regarding the separate classification system maintained by defendant unequivocally supports the conclusion that JBWs of *all* grades should have been within the same job classification and been paid the same wage as Bookbinders during the relevant time period. This is so, plaintiffs contend, because the Court's finding mandates a single classification of jobs, and since all Bookbinders are paid the same wage, all employees within the single classification should be paid an equal wage.

Defendant vigorously opposed such a conclusion. Defendant correctly indicates that the Court found that defendant violated the Equal Pay Act with respect to only 28 grade 4 JBWs. As to the remainder of the plaintiff class, the Court did not find that the grades 2, 3 and 5 JBWs were entitled to equal pay with that of Bookbinders. Defendant submits that the Court's finding that the class has been deprived of its rights under Title VII in terms of access to "Craft" and supervisory positions is not in contradiction with a finding that only grade 4 JBWs should have received equal wages with Bookbinders.

The Court is not prepared to conclude that the elimination of the disparate advancement opportunities, resulting in part from the separate classification of JBW and Bookbinder positions, mandates the imposition of equal wages for all of the various positions. The distinction between "Craft" and "Non-craft" employees on its face does not offend Title VII in the context of this case. Rather, it is the foreclosure of advancement opportunities to JBWs resulting from the separate classification system and the apprenticeship program *operating together* which cannot withstand Title VII scrutiny. Compensation for the economic loss caused by this foreclosure simply does not entail the imposition of equal wages for JBWs and Bookbinders. The Court specifically found that JBW grades 2, 3 and 5 were not entitled to wages equal to those earned by Bookbinders because plaintiffs had failed to prove substantial equality of the various positions. *Id.* To equate the wages of all JBWs with the wages of all Bookbinders is not supportable by the Court's findings and conclusions with regard to the defendant's Title VII liability. Accordingly, the portion of the back pay requested by plaintiffs seeking to equalize the wages paid to grades 2, 3 and 5 JBWs with those paid to Bookbinders during the relevant recovery period is not justified and shall be denied.

1. *Back Pay for Discriminatory Denial of Promotions.*

As a result of the defendant's discriminatory practices enumerated above, plaintiffs have been unlawfully denied the equal op-

portunity to advance within the GPO Bindery. Members of the class have been effectively precluded from advancing to Bookbinder positions, supervisory positions and Printing Specialist positions (hereinafter referred to collectively as "promotion positions"). It is beyond dispute that such a preclusion resulted in economic loss to plaintiffs: all of the promotion positions were and are higher paying than the JBW positions in which plaintiffs have been effectively frozen. The economic loss suffered by the plaintiffs is the loss associated with the denial of equal opportunity for advancement within the GPO Bindery. Clearly, plaintiffs are entitled to be compensated for this loss. *Pettway v. American Cast Iron Pipe Co., supra.*

An appropriate approach to the determination of the relief to which plaintiffs are entitled as a result of the foreclosure of advancement opportunities is not easily defined. As the Fifth Circuit has observed:

> The method of calculating a class-wide back pay award must not be rigid. This results from the impossibility of calculating the precise amount of back pay. There is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system, and apprentice and on-the-job training programs had not been in existence. Class members outnumber promotion vacancies; jobs have become available only over a period of time; the vacancies enjoy different pay rates; and a determination of who was entitled to the vacancy would have to be determined on a judgment of seniority and ability at that time. This process creates a quagmire of hypothetical judgments. *Johnson v. Goodyear Tire and Rubber Co., supra*, 491 F.2d 1364 at 1379 (5th Cir.).

*Pettway v. American Cast Iron Pipe Co., supra* at 260. The Court in *Pettway* further stated, however, that "[i]t does not follow that back pay claims based on promotions cannot be awarded." *Id.*

Because it is practically impossible to determine which class members would have been promoted absent discrimination, a formula approach to back pay is indicated. The loss to plaintiffs should be measured, in terms of back pay, by the wages they would have received collectively had they obtained promotions absent discrimination. While arriving at this measure is not a simple task, it can be accomplished by reconstructing the promotions that actually took place during the relevant time period and attributing to plaintiffs a share of those promotions for purposes of back pay. A similar approach has been discussed and approved by the Fifth Circuit in *Pettway*:

> Another method of computation can be categorized as a formula of comparability or representative employee earnings formula. Approximations are based on a group of employees, not injured by the discrimination, comparable in size, ability, and length of employment—such as "adjacent persons on the seniority list or the average job progress of persons with similar seniority"—to the class of plaintiffs.

494 F.2d at 262 (footnote omitted). The Fifth Circuit called this a "comparability formula" and explained the operation of a similar formula approach suggested by the Equal Employment Opportunity Commission:

> In other words, the total award for the entire class would be determined. At that point, individual claims would be calculated on *pro rata* shares for those workers of similar ability and seniority claiming the position, possibly eliminating the necessity of deciding which one of many employees would have obtained the position but for the discrimination. Claimants dissatisfied with their portion of the award could be allowed to opt out in order to prove that they were entitled to a larger portion. *Cf.* Fed.R.Civ.P. 23(d)(2); *Protective Committee v. Anderson*, 390 U.S. 414, 435, n.17, 88 S.Ct. 1157, 1169 n.17, 20 L.Ed.2d 1 (1968).

494 F.2d at 263 n.154. *See also United States v. United States Steel Corp.*, 520 F.2d 1043, 1055–56 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

The formula approach employed in the Court's remedial order will attribute 50% of all promotion positions filled in the relevant recovery period to the plaintiff class. An exact percentage share of the promotions to which plaintiffs are entitled is not determinable. However, unrealistic exactitude is not required and uncertainties in determining what an employee would have received in terms of promotions, but for the discrimination, should be resolved against the discriminating employer. *Pettway, supra* at 260–61. The applicant pool from which the various Bookbinder, supervisory and Printing Specialist positions should have been selected includes the classifications of JBW (all grades) and Bookbinders. The composition of the combined classifications, as of 1973, is approximately 50% women and 50% men. This percentage will be utilized in the formula to determine the back-pay award to which the plaintiffs are entitled under Title VII.

Finally, for purposes of clarity and in anticipation of later confusion, the Court reiterates one facet of the scope of this Title VII back pay award: Whether or not an individual plaintiff applied for a promotion position, that member is entitled to share in the relief provided by the formula discussed above. This conclusion is well-supported in the Court's Opinion regarding defendant's Title VII liability. *See* Opinion at 1161–1163. Furthermore, the prevailing Equal Pay Act plaintiffs are entitled to relief under the Equal Pay Act as well as Title VII so long as they do not receive overlapping relief for the same wrong. *Laffey v. Northwest Airlines, Inc., supra* at 445.

**B. Back Pay under the Equal Pay Act.**

The Court found that defendant violated the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d)(1) (1976), by paying higher wages to male Bookbinders than to female grade 4 JBWs for equal work on jobs the performance of which requires equal skill, effort, responsibility and which are performed under similar working conditions. *Opinion* at 1167. Furthermore, applying the standards established in *Laffey v.*

*Northwest Airlines, supra,* the Court found defendant's violations of the Equal Pay Act willful. *Id.*

The term "prevailing Equal Pay Act plaintiffs" shall refer collectively to the five-named plaintiffs and the 23 other grade 4 JBWs, listed on Exhibit A to the Court's remedial order, who became parties plaintiff with respect to the Equal Pay Act aspects of this lawsuit pursuant to 29 U.S.C. § 216(b). The Court granted judgment to defendant on the Equal Pay Act claims of all JBWs other than grade 4 because plaintiffs failed to prove substantial equality of the Bookbinder positions and the positions of JBW grades 2, 3 and 5. *Id.* at 1167.

The prevailing Equal Pay Act plaintiffs are entitled, as a matter of right, to the relief set forth in 29 U.S.C. §§ 216–17: (1) back pay as a result of the initial wage differential; and (2) an amount equal to the back-pay award as liquidated damages; and (3) reasonable attorneys' fees and costs of the action.

**1. Back Pay as a Result of the Initial Wage Differential.**

The prevailing Equal Pay Act plaintiffs are clearly entitled to receive an amount equal to the difference between the wages actually paid them during the relevant time period and the wages which would have been paid them had they been compensated as Bookbinders. The Court's remedial order includes a provision implementing such an award.

**2. Liquidated Damages.**

The standard for awarding liquidated damages under the Equal Pay Act, 29 U.S.C. §§ 216, 260 (1976) was set forth by the Court of Appeals for this Circuit in *Laffey v. Northwest Airlines, Inc., supra,* 567 F.2d at 464–65:

Congress [conferred] the present discretion on the courts to limit or deny liquidated damages if the employer could meet the "substantial burden" of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance. If the employer cannot con-

vince the court in these respects, an award of liquidated damages remains mandatory. . . . (footnotes omitted). Under this standard, an award of liquidated damages to the prevailing Equal Pay Act plaintiffs is mandatory because defendant has failed to satisfy the Court that its failure to comply with the Equal Pay Act was in good faith. Accordingly, a provision awarding liquidated damages in an amount equal to the award of back pay shall be included in the Court's remedial order.

### 3. Attorney's Fees and Costs.

The prevailing Equal Pay Act plaintiffs are entitled to an award of "a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b) (1976). The Court, however, declines to rule on the appropriate amount of the fee and cost award in the absence of a formal petition requesting specific dollar amounts.

### C. The Appropriate Retroactive Recovery Period for Purposes of Back Pay under Title VII and the Equal Pay Act.

### 1. Title VII

The Court must resolve whether the class members are entitled to back pay to remedy any discrimination they might have suffered before March 24, 1972, the date on which Congress gave employees of the federal government the right to sue under Title VII. It is plaintiff's position that pre-March 24, 1972, discrimination may be taken into account for purposes of back pay because (1) the defendant's liability is the result of a "continuing violation" of Title VII, and (2) as a result of the fifth amendment and several executive orders, the federal government was prohibited from discriminating against federal employees on the basis of sex well before Title VII was made applicable to the federal government on March 24, 1972.

The Equal Employment Opportunity Act of 1972[2] ("1972 Act") created a new § 717(c) for Title VII which permits employees of the federal government who suf-

fer employment discrimination to seek relief in the federal courts. 42 U.S.C. § 2000e–16(c) (1976). As a result, back pay became available to federal employees to compensate them for discriminatory conduct by the federal government. Prior to the 1972 Act, an award of back pay against the federal government was apparently barred by the principle of sovereign immunity:

> Although an action seeking to enjoin unconstitutional agency conduct would lie [before March 24, 1972], it was doubtful that back pay or other compensatory relief for employment discrimination was available at the time that Congress was considering the 1972 Act.

*Brown v. General Services Administration*, 425 U.S. 820, 826, 96 S.Ct. 1961, 1964–1965, 48 L.Ed.2d 402 (1976) (footnote omitted). The 1972 amendments to Title VII removed the "legal obstacles" that federal employees had faced "in obtaining meaningful remedies," including back pay, for acts of employment discrimination. H.R.Rep.No. 92–238, 92d Cong., 2d Sess. 25, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2137, 2160.

Several courts have held that § 717(c) of Title VII may be applied retroactively where the complaint was pending administratively or judicially on the effective date of the 1972 amendments. *Womack v. Lynn*, 504 F.2d 267 (D.C.Cir.1974); *Mahroom v. Hook*, 563 F.2d 1369, 1373 (9th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402 (1978); *Eastland v. Tennessee Valley Authority*, 553 F.2d 364, 367 (5th Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977); *Weahkee v. Powell*, 532 F.2d 727, 729 (10th Cir. 1976); *Adams v. Brinegar*, 521 F.2d 129, 133–34 (7th Cir. 1975); *Koger v. Ball*, 497 F.2d 702, 704 (4th Cir. 1974). The rationale of these decisions is that, because a federal employee's right to be free from discrimination had existed before the passage of the 1972 Act, § 717(c) did not create a new substantive right, but rather provided a new remedy for enforcing an existing right. Retroactive application

2. Pub.L.No. 92–261, § 11, 86 Stat. 103.

of § 717(c) to pending claims was justified by the common-law principle that "[p]rocedural statutes that affect remedies are generally applicable to cases pending at the time of enactment." *Koger v. Ball, supra* at 706 (footnote omitted); *Womack v. Lynn, supra* at 269. Of course, since plaintiffs did not file their administrative complaint alleging patterns and practices of discrimination against the class until May 25, 1973, they are not within the ambit of the rule enunciated above. The Court is not persuaded, however, that the authority cited above suggests that the 1972 Act may be applied retroactively *only* to cases pending on the effective date of the Act. At least one court has squarely rejected such a suggestion:

> We perceive no distinction between those cases in which the illegal conduct had occurred prior to the enactment of the 1972 amendment where there was already pending a claim based upon such conduct and a case like the one we are concerned with, where the claim had not yet been filed . . . . *Laurel* [*v. United States*, 547 F.2d 917 (5th Cir. 1977)], holds that the 1972 Amendments do apply to a claim of pre-Amendment discrimination where that claim was administratively filed several months after the Amendment became effective.

*Huntley v. HEW*, 550 F.2d 290, 295–96 (5th Cir. 1977).

The Court can perceive no material distinction between cases involving the retroactive application of the 1972 Act to pending claims and cases like the one at bar, involving claims of pre-Act discrimination filed after March 24, 1972. The rationale supporting retroactive application to pending claims applies with equal force to suits filed after the effective date of the Act involving claims of pre-Act discrimination. Federal employees enjoyed the right to be free from employment discrimination long before passage of the 1972 Act.[3] When Congress added a judicial remedy and authorized awards of back pay in 1972, it was not creating new rights in federal employees, but rather was affording them more effective remedies for redress of violations of preexisting rights. As the court in *Chewning v. Schlesinger*, 471 F.Supp. 767, 774 (D.D.C.1979), observed:

> To exclude the effects of pre-Act discrimination from the computation of back pay in the present case would frustrate the remedial purposes of the 1972 amendments by impairing the ability of the class members to vindicate fully their long-established right to be free from employment discrimination.

(footnote omitted).

The defendant vigorously opposes such a conclusion, arguing that under no circumstances should back pay be awarded for discriminatory conduct occurring earlier than March 14, 1972, the date sovereign immunity was waived and GPO employees were granted the right to sue under Title VII. Essentially, defendant submits that because the terms of the 1972 Act are silent on the issue of the government's liability in damages for pre-Act discrimination, full retroactive application of § 717(c) would offend the rule of strict construction followed in waivers of sovereign immunity.[4] In rejecting a similar argument made in *Chewning v. Schlesinger, supra*, the court persuasively stated:

> This attempt to constrict the scope of the waiver intended by Congress is directly at odds with the principle that remedial statutes, including those expressly involving the government, should be construed liberally. In rejecting the contention that the 1972 Act only waived sovereign immunity prospectively, one court stated that "[i]t is a well settled rule of construction that 'a remedial statute shall be so construed as to make it effect its evident purpose and if the reason of the

---

3. *See Womack v. Lynn, supra* at 269 & n.5.

4. It has long been established that "a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally ex-

pressed.'" *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–954, 47 L.Ed.2d 114 (1976) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)).

statute extends to past transactions, as well as to those in the future, then it will be so applied.'" *Henderson v. Defense Contract Administration Services,* 370 F.Supp. 180, 183 (S.D.N.Y.1973) (quoting *Walker v. Kleindienst,* 357 F.Supp. 749, 751 (D.D.C.1973)).

471 F.Supp. at 774 (footnotes omitted). As was noted in *Chewning, id.* at 775, because Congress was aware of the rule favoring retroactive application of remedial statutes, it accords fully with the congressional waiver of immunity to award federal employees back-pay relief for the effects of the pre-Act discrimination. *See also Koger v. Ball, supra* at 708–09. Accordingly, in determining the back-pay award pursuant to the "rightful place" formula included in the Court's remedial order, the effects of continuing pre-Act discrimination may be considered. This manner of computing back pay is consistent with the "make whole" purposes of Title VII and will restore the plaintiffs to the economic positions in which they would have been absent discriminatory denial of promotion opportunities. *See Verzosa v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 589 F.2d 974 (9th Cir. 1978); *Miller v. Miami Prefabricators, Inc.,* 438 F.Supp. 176, 180–82 (S.D.Fla.1977). The appropriate starting date for consideration of pre-Act discriminatory conduct by the GPO remains to be addressed.

The declaration of antidiscrimination contained in 42 U.S.C. § 2000e–16(a) (1976) is as broad as the policies mandated by the series of executive orders, beginning in 1965, in which the President required compliance by federal agencies with the policy of nondiscrimination stated in the Civil Rights Act of 1964, Pub.L. No. 88–352, § 701(b), 78 Stat. 241. Exec. Order No. 11246, 30 Fed.Reg. 12319 (1965); Exec. Order No. 11375, 32 Fed.Reg. 14303 (1967); Exec. Order No. 11478, 34 Fed.Reg. 12985 (1969) (superseding parts of Exec. Order Nos. 11246, 11375); Exec. Order No. 11590, 36 Fed.Reg. 7831 (1971) (amending Exec. Order No. 11478). *See Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41

L.Ed.2d 290 (1974). The presidential mandate was not made expressly applicable to the Government Printing Office until August 8, 1969, the date of Executive Order No. 11478, 34 Fed.Reg. 12985 (1969). Because August 8, 1969, was the promulgation date of the first antidiscrimination executive order applicable to the GPO and codified in the 1972 Act, this date will be utilized as the starting point in computing the Title VII back-pay award to which the plaintiffs are entitled as a result of the defendant's continual discriminatory conduct. A provision in accordance with the foregoing will be included in the Court's remedial order.

*2. The Equal Pay Act*

Because the Court found defendant's violations of the Equal Pay Act willful, there is a three-year period of limitations for recovery. 29 U.S.C. § 255(a) (1976); *Laffey v. Northwest Airlines, Inc., supra* at 458. With respect to all of the prevailing Equal Pay Act plaintiffs save one, a portion of the three-year period extends prior to May 1, 1974, the effective date of the amendments to 29 U.S.C. § 203, which included the defendant within the definition of an employer.[5] Plaintiffs submit that the reasoning adopted by the Court in considering the retroactivity of the 1972 amendments to Title VII also supports the conclusion that the recovery period under the Equal Pay Act may extend prior to May 1, 1974. Defendant finds the analysis required by the two statutes distinguishable because, it contends, the 1974 amendments to the Equal Pay Act created new substantive rights for federal employees while the 1972 amendments of Title VII merely created new remedies. The Court concludes that the 1974 amendments to the Equal Pay Act created new remedies for preexisting rights and therefore will allow retroactive application thereof in the case at bar.

The Court of Appeals of this Circuit, while not addressing the specific issue confronting the Court, has observed that "the Equal Pay Act, and the Fair Labor Standards Act of which the former is a part,

---

**5.** Fair Labor Standards Amendments of 1974, Pub.L.No. 93–259, § 6(a)(1), 88 Stat. 55.

undoubtedly are remedial statutes, as such to be liberally construed in favor of their intended beneficiaries," *Laffey v. Northwest Airlines, Inc., id.* at 461 (footnote omitted). Every violation of the Equal Pay Act is also a violation of Title VII. It seems clear that the 1974 amendment to the Equal Pay Act simply made available to plaintiffs whose claims meet the strict requirements of 29 U.S.C. § 206(d) (1976) automatic back wages, the potential for liquidated damages and a three-year statute of limitations for willful violations. The rights protected by the Equal Pay Act are preexisting rights also protected under Title VII. The 1974 amendments to the Equal Pay Act merely augmented the remedies available to federal employees confronted with employment discrimination. As a remedial statute, the 1974 amendment must be construed liberally to effect its evident purpose. *Id.* at 461. The Court concludes that restricting the scope of recovery in the instant case to 1974 offends the remedial purpose of the amendment and does not comport with the rule of liberal construction enunciated above. Accordingly, the prevailing Equal Pay Act plaintiffs, listed in Exhibit A to the Court's remedial order, must be allowed to recover back pay for the period of three years prior to the date they respectfully filed their consents pursuant to 29 U.S.C. § 216(b) (1976). A provision in accordance with the foregoing will be included in the Court's remedial order.

### D. *Front Pay Under Title VII.*

Imposition of a front-pay obligation in the instant case is appropriate because of the effective foreclosure to the class of advancement opportunities within the GPO Bindery. Such an award is necessary to restore the economic loss members of the class will continue to suffer until they attain their rightful place pursuant to provisions of the Court's remedial order. The front-pay provision included in the Court's order will operate on the same basic formula utilized in the back-pay provision under Title VII. Such an approach was approved by the Fourth Circuit in *Patterson v. American Tobacco Co.,* 535 F.2d 257, 269 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314,

50 L.Ed.2d 286 (1976). *See also James v. Stockham Valves, supra* at 358; *Chewning v. Schlesinger, supra* at 776.

### E. *Equalization of Wages Under the Equal Pay Act.*

Beginning with the date of this memorandum opinion and accompanying order, defendant shall pay all JBW grade 4 employees the wages prescribed in the then-current Bookbinder pay scale. Such employees shall be entitled to all the rights and benefits associated with the position of Bookbinder, and the status of "Craft" employee, without limitation. A provision in accordance with the foregoing shall be included in the Court's remedial order.

### F. *Appointment of a Special Master.*

The Court has decided to appoint a special master pursuant to Federal Rule of Civil Procedure 53. The duties of the special master are set forth in the accompanying remedial order. Generally, the special master will supervise the implementation of the relief awarded to the class pursuant to the remedial order.

### G. *Necessity of Joining Union Locals.*

Defendant has indicated its opinion that it is necessary to join as parties to this action the two union locals which represent JBWs and Journeyman Bookbinders. Defendant submits that because of the labor-management contracts between the GPO and these locals, it is necessary to join the locals before the Court issues its remedial order in this case. Without such joinder, defendant argues, defendant would be subject to conflicting obligations imposed by the existing contracts and the Court's remedial order. Plaintiffs oppose this argument, stating that it is not necessary to join the locals for the Court to fashion the appropriate relief and that defendant will not be exposed to conflicting obligations without joinder. Because the Court views defendant's contentions regarding the potentiality of conflicting obligations as speculative, the Court finds it unnecessary to join the two locals at this late stage in the proceedings. The Court is confident that any problems defendant will encounter as a result of the

Court's remedial order and the labor-management contracts between defendant and the locals can be resolved by good faith negotiation with the two locals involved. In the unlikely event that genuine conflicts in defendant's obligations under the remedial order and the contracts do arise, and, negotiation with the locals fails to resolve them, defendant may bring any such conflicts to the attention of the special master and, if necessary, the Court.

## ORDER

Upon consideration of the entire record herein and, in accordance with the Memorandum Opinion and Order of October 1, 1979, and the Memorandum Opinion of even date herewith, it is, by the Court, this 20 day of May, 1980,

ORDERED,

## I. DEFINITIONS

(1) The term "Title VII class plaintiff(s)" shall refer, collectively, to all female Journeyman Bindery Workers ("JBWs") employed by the Binding Division of the Government Printing Office (GPO) at any time on or after May 25, 1973;

(2) The term "prevailing Equal Pay Act plaintiff(s)" shall refer, collectively, to the five-named plaintiffs and to the 23 other Wage Board Grade 4 JBWs listed on Exhibit A who became parties plaintiff with respect to the Equal Pay Act aspects of this lawsuit pursuant to 29 U.S.C. § 216(b) (1976);

(3) The term "Equal Pay Act recovery period" shall refer, for each of the prevailing Equal Pay Act plaintiffs, to the period commencing three years prior to the date set opposite each such plaintiff's name on Exhibit A (which is the date on which each such plaintiff consented, pursuant to 29 U.S.C. § 216(b) (1976) to become an Equal Pay Act plaintiff) and ending on the date defendant equalizes wages in accordance with paragraph III of this Order;

(4) The term "wages" shall refer to compensation for services performed, and shall include shift differentials, overtime, annual leave, sick leave, and workman's compensation; and

(5) The term "promotion position(s)" shall refer to any position, filed on a temporary or permanent basis, including: Journeyman Bookbinder, Assistant Group Chief, Group Chief, Assistant Foreman, Foreman, Assistant Superintendent, Controller, Locator, and Bindery Printing Specialist. Such term shall also refer to any Printing Specialist position outside the Bindery which at any time was filled by a person who was formerly a Journeyman Bookbinder.

## II. GENERAL INJUNCTION

It is

FURTHER ORDERED, that the defendant (the Government Printing Office and Public Printer), its officials, agents, employees, successors and all persons or organizations in active concert or participation with it, hereby are permanently enjoined and restrained from discriminating in any aspect of employment against the class plaintiffs on the basis of sex and from failing or refusing to implement fully, or to participate and cooperate in the implementation of, the provisions set forth in this Order; and it is

FURTHER ORDERED, that no person shall be retaliated against or discriminated against by defendant, its officials, agents, employees and successors because that person has opposed any practice of defendant challenged in this lawsuit, because that person is a member of the plaintiff class or because he or she has made a charge, testified, assisted or participated in any manner in any stage of the investigation, proceeding or hearing of this case; and it is

FURTHER ORDERED, that it shall be a violation of this Order for defendant, its officials, agents, employees, and successors to deny, deprive or attempt to deny or deprive, any member of the plaintiff class a right or benefit to which she is entitled by the terms and provisions of this Order.

## III. EQUALIZATION OF WAGES

It is

FURTHER ORDERED, that beginning with the date of this Order, defendant shall pay all JBW Grade 4 employees the wages prescribed in the then-current Journeyman Bookbinder pay scale (base pay and overtime, if any). Such employees shall be entitled to all the rights and benefits associated with the position of Journeyman Bookbinder, and the status of "Craft" employee, without limitation; and it is

FURTHER ORDERED, that beginning with the date of this Order, any pension payment made to any JBW grade 4 shall be computed as though said employee had been classified and paid as a Journeyman Bookbinder from May 25, 1971, or the date of her employment, whichever is later; and it is

FURTHER ORDERED, that defendant shall not reduce the wage rate of any employee in order 1) to accomplish the equalization of wages required by this Order, or 2) otherwise to comply with the provisions of 29 U.S.C. § 206(d) (1976).

## IV. INJUNCTION AGAINST FUTURE DISCRIMINATION

It is

FURTHER ORDERED, that defendant shall not discriminate on the basis of sex among employees in the GPO Bindery by paying wages to members of one sex at a rate less than that paid to members of the opposite sex for work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions; and it is

FURTHER ORDERED, that defendant shall not discriminate on the basis of sex in the filling of any promotion position (as defined in this Order) in the Bindery Division, nor shall defendant perpetuate the effects of past discrimination by according a preference to Journeyman Bookbinders over JBWs; and it is

FURTHER ORDERED, that the defendant shall permit JBWs the same opportunities, traditionally afforded to Journeyman Bookbinders, to train on Bookbinder jobs; and it is

FURTHER ORDERED, that defendant shall not hire or reassign any individual from outside the Bindery or appoint any apprentice to fill any position in the Bookbinder classification until all JBWs, on the basis of their seniority as a JBW, have been afforded an opportunity to bid and train on such position. In all cases, the training required for such position shall be the minimum time required for the JBW to become proficient in such position consistent with safety and efficiency. Any dispute as to the minimum time required for training shall be resolved by the special master; and it is

FURTHER ORDERED, that as of the date hereof, the defendant shall follow the same procedures in making work assignments for the jobs performed by the class plaintiffs and for the jobs performed by Journeyman Bookbinders; and it is

FURTHER ORDERED, that defendant shall establish written, objective job-related hiring criteria, without disparate impact against women, for the filling of all promotion positions (as defined in this Order) and all JBW positions when such positions become available. If the cooperation of the Office of Personnel Management is required to comply with this provision, defendant shall seek such cooperation; and it is

FURTHER ORDERED, that with respect to recruitment for jobs performed by Journeyman Bookbinders and JBWs and for any training or apprentice program to fill such jobs, all future hiring and appointments shall be done without regard to sex. When such hiring or appointment is to take place, defendant shall take all reasonable steps to insure that adequate notification is given to prospective female applicants of such hiring or appointment. This recruitment shall include, but is not limited to, notifying all offices of any state employment service in the Metropolitan-Washington area and all job information centers maintained by the Office of Personnel Management in the Washington area. If the cooperation of the Office of Personnel Management is required to comply with this provision, de-

fendant shall seek such cooperation; and it is

FURTHER ORDERED, defendant shall provide training to JBWs for supervisory positions in the same manner such training is currently provided to Journeyman Bookbinders; and it is

FURTHER ORDERED, that defendant shall hereafter permit JBWs to compete for Printing Specialist positions outside the Bindery without any "Craft" status prerequisite.

## V. MONETARY AWARD TO PREVAILING EQUAL PAY ACT PLAINTIFFS UNDER THE EQUAL PAY ACT AND TITLE VII

It is

FURTHER ORDERED, that defendant shall pay to each prevailing Equal Pay Act plaintiff the following monetary amounts:

(1) For each pay period during her Equal Pay Act recovery period (see I(3), *supra*) in which she received wages from defendant for services as a JBW Grade 4, the difference between the wages actually paid her (as defined in this Order) and the wages which would have been paid her had she been compensated as a Journeyman Bookbinder;

(2) In addition, as liquidated damages, an amount equal to the total payments to be paid her under subparagraph (1) above; and

(3) For each pay period between May 25, 1971, and the day preceding the commencement of her Equal Pay Act recovery period in which she received wages from defendant as a JBW grade 4, the difference between the wages actually paid her (as defined in this Order) and the wages which would have been paid to her had she been compensated as a Journeyman Bookbinder.

(4) If she received pension payments between May 25, 1971, and the date on which defendant equalizes wages of grade 4 JBWs pursuant to section III of this Order, the difference between the pension payments made to her and those that would have been made to her had they been computed

on the basis of her having been classified and paid the same as a Journeyman Bookbinder from May 25, 1971, or such later date she commenced working as a grade 4 JBW.

## V(A). BACK PAY UNDER TITLE VII FOR WAGE DISCRIMINATION AGAINST GRADE 4 JBW TITLE VII PLAINTIFFS WHO ARE NOT ALSO EQUAL PAY ACT PLAINTIFFS

(1) For each pay period between May 25, 1971, and the date upon which defendant equalizes wages in accordance with section III of this Order in which she received wages from defendant as a JBW Grade 4 Smyth Sewing Machine Operator, the difference between the wages actually paid to her (as defined in this Order) and the wages which would have been paid her had she been compensated as a Journeyman Bookbinder.

(2) If she received pension payments at any time between May 25, 1971, and the date upon which defendant equalizes wages of JBW Grade 4s in accordance with section III of this Order, the difference between the pension payments made to her and those which would have been made to her had they been computed on the basis of her having been classified and paid as a Journeyman Bookbinder throughout the period of her employment as a Grade 4 JBW from May 25, 1971.

## VI. BACK PAY UNDER TITLE VII FOR DISCRIMINATION IN MAKING PROMOTIONS

It is

FURTHER ORDERED, that with respect to each promotion position (as defined in this Order), each Title VII plaintiff shall be compensated as follows:

(1) With respect to each pay period between May 25, 1971, and the date hereof in which she received wages from defendant as a JBW, the difference between such wages and the wages she would have received on a pro-rata basis had JBWs filled one-half of all promotion positions (as defined in this Order) commencing August 8, 1969. By way of illustration, if (i) during

a particular pay period there were 300 JBWs and 60 promotion positions; and (ii) the total increment for 30 promotion positions (one-half of 60) for that pay period was $3,000; then (iii) each JBW would receive $10 for that pay period as back pay under this provision. The "promotion positions" referred to herein are the promotion positions, as defined in this Order, which were filled between August 9, 1969, and the last day of the particular pay period for which back pay is being computed under this provision.

(2) However, Grade 4 JBWs shall participate in payments, pursuant to the back pay award provided for above, only for lost promotional opportunities associated with the promotion positions (as defined in this Order) other than Journeyman Bookbinder.

(3) If she received pension payments at any time between May 25, 1971, and the date of this Order, the difference between the pension payments made to her and those that would have been made to her had they been computed on the basis of her having received as wages the additional sums provided for in subparagraph VI(1) of this Order.

## VII. FRONT PAY UNDER TITLE VII FOR DISCRIMINATION IN MAKING PROMOTIONS

It is

FURTHER ORDERED, that from the date hereof, until the class plaintiffs fill one-half of all promotion positions in the Bindery, for each pay period each Title VII plaintiff remains employed by defendant, she shall receive the difference between her wages and the wages she would have received on a pro-rata basis as if JBWs for that pay period filled one-half of all promotion positions in the Bindery or a proportionate number of such promotion positions, whichever number is lower; provided, however, that no JBW receiving a promotion shall receive compensation under this paragraph after receiving said promotion. It is provided further that, because of the equalization of wages ordered in part III *supra*, the Grade 4 JBWs shall not receive any compensation under this paragraph.

## VII(A). PENSION PAYMENTS UNDER TITLE VII FOR DISCRIMINATION IN MAKING PROMOTIONS

It is

FURTHER ORDERED, that from the date hereof, each Title VII plaintiff's pension payments shall be computed on the basis of her having received as wages the additional sums provided for in sections VI and VII of this Order.

## VIII. FILLING OF PROMOTION POSITIONS WITH JBWs

It is

FURTHER ORDERED, that until such time as females hold 50% of all promotion positions in the Bindery, or until such time as defendant puts into effect a procedure satisfactory to plaintiffs acting through their counsel, or if no plan can be devised acceptable to both defendant and plaintiffs, until the Court resolves any dispute as to any appropriate plan, to assure that goals and timetables are established and that females will be permitted to compete for promotion positions in a non-discriminatory fashion, three-fourths of all promotion positions in the Bindery shall be filled with class plaintiffs, to the extent qualified class plaintiffs are available, after being afforded the opportunity to train for the particular position, to fill such positions. In determining which promotion positions shall be filled by class plaintiffs, the first three of every four available promotion positions shall be filled by class plaintiffs. Promotion positions presently held on a temporary basis shall be considered vacant for purposes of this provision. Furthermore, no special preference is to be accorded persons presently holding any promotion position on a temporary basis when these positions ultimately are filled on a permanent basis; and it is

FURTHER ORDERED, that the final selection of the class plaintiff entitled to each such promotion position shall be made by the special master with the assistance of a promotion panel consisting of three individuals experienced in the field of industrial

management and classification analysis in the field of setting standards of pay for work in the federal sector; and it is

FURTHER ORDERED, that plaintiffs, through counsel, shall nominate one member of the panel; defendant shall nominate one member of the panel; and the special master shall nominate one member of the panel who will serve as chairman of the panel. Provided, however, that the nominations of panel members shall be approved by the Court; and it is

FURTHER ORDERED, that the special master shall consult with counsel for the parties as to the means and method of payment for the services of the panel members. Absent the parties consent to pay for the panel's services, the special master shall, subject to prior approval of the Court before the panel begins its work, determine any other lawful means of compensation of the panel members; and it is

FURTHER ORDERED, that in choosing the class plaintiff among various competitors for the promotion position, the special master and the promotion panel shall take into consideration any or all of the following factors which they consider relevant for the particular selection:

(1) All evidence presented by the applicant which would establish her "rightful place" in the Bindery supervisory structure absent discriminatory denial of promotions in the past, including prior applications for promotions and qualifications for supervisory training;

(2) The breadth of the applicant's work experience in both machine and hand bindery operations;

(3) The applicant's prior supervisory experience either inside or outside the GPO;

(4) Evidence of applicant's abilities to initiate suggestions for improving production, whether or not such abilities have been officially recognized by defendant;

(5) Evidence of the applicant's leadership abilities;

(6) The special master or panel's evaluation of the applicant on the basis of personal interviews; and

(7) Any evidence presented by defendant relevant to the qualifications of the applicant, including supervisory evaluations; provided, however, that such evaluations are not controlling.

For the purpose of this section VIII only, the term promotion position shall not include the position of Journeyman Bookbinder.

## IX. SPECIAL MASTER

It is

FURTHER ORDERED, that the Honorable Lawrence S. Margolis, United States Magistrate, is hereby appointed Special Master in this action pursuant to Local Rule 3–8(b)(6). In addition to the duties imposed upon him by Rule 53 of the Federal Rules of Civil Procedure, the Special Master shall:

1. Administer all aspects of the remedial Order in this action including, but not limited to, establishing dates for compliance with specific aspects of the Order, monitoring defendant's progress in implementing the Order and requiring reports on defendant's implementation of the Order in addition to those already required therein;

2. Take evidence and decide all facts necessary to formulate the relief ordered by the Court;

3. Report to the Court, if appropriate, as to defendant's progress in implementing the Order. Such reports shall be submitted when requested by the Court or whenever the Special Master believes that a report is appropriate. Copies of any such report shall be provided by the Special Master to the parties;

4. In the event of noncompliance with the Order, advise the Court of such noncompliance and whether, in the Special Master's opinion, the noncompliance is of such a nature as to justify modification of the Order or other action by the Court;

5. Establish such recordkeeping requirements in addition to or in lieu of those provided in the Order as he may deem necessary to implement and insure strict compliance with the terms and provisions of the relief ordered by the Court; and

6. The Special Master shall have the power to suggest modifications or amendments of this Order.

Within the limitation of this reference, the Special Master is hereby invested with the powers set forth in Rule 53 of the Federal Rules of Civil Procedure, and that Rule shall govern any proceedings before him. The Special Master shall have the authority to request from the defendant oral or written reports concerning efforts that have been taken to comply with the Order and defendants shall provide the Special Master with such information as he shall from time to time request; and it is

FURTHER ORDERED, that except for any matter expressly required by this Order to be presented directly to the Court, any disputes between the parties regarding the interpretation or implementation of this Order shall be presented in the first instance to the Special Master. No party shall present any dispute to the Special Master unless the party has first notified the other party and made a good faith effort to resolve the matter by agreement. Any party may appeal any decision of the Special Master under this Order by filing a request for review with this Court within ten days of such decision. Delays beyond this ten-day period shall be allowed only upon a showing of good cause.

## X. RECORDKEEPING AND REPORTS

It is

FURTHER ORDERED, that defendant shall maintain for at least three years all records relating to this Order, including:

(1) wages paid to Title VII plaintiffs and persons presently holding the position of Journeyman Bookbinder;

(2) applications for the positions of JBW (all grades) and Journeyman Bookbinder;

(3) action taken with respect to those applications;

(4) education and training afforded to Title VII plaintiffs and Journeyman Bookbinders;

(5) actions taken with respect to any apprenticeship or training program for individuals within the GPO Bindery other than class plaintiffs;

(6) promotions to supervisory positions in the GPO Bindery;

(7) complaints and disputes relating to the implementation of this Order; and it is

FURTHER ORDERED, that within three months of the date hereof, defendant shall submit to counsel for plaintiffs a proposed comprehensive plan to implement this Order and to correct the discrimination and the present effects of past discrimination found by this Court to have existed and to exist; and it is

FURTHER ORDERED, that within three months of the date hereof and every six months thereafter, for a period of three years, defendant shall file with the Court and the Special Master, and provide copies to counsel for plaintiffs, a report setting forth:

(1) respecting any person currently holding a JBW, Bookbinder or other promotion position in the GPO Bindery, any change in status, including promotion, transfer, resignation and retirement and, if known, the reasons therefor;

(2) respecting all recruitment and hiring to craft positions in the GPO Bindery, all efforts to recruit employees, the identities of persons hired, including sex, the reasons why the persons were hired, and a general description of the persons not hired, including a breakdown by sex; provided, however, that the identities of the persons not hired need not be disclosed;

(3) all complaints or disputes, involving any form of discrimination, regarding craft employees or JBWs in the GPO Bindery, including the action taken or not taken and the reasons therefor; and

(4) any deviation from the provisions of this Order.

## XI. MECHANICS FOR PAYMENT PURSUANT TO THIS ORDER

It is

FURTHER ORDERED, that counsel for plaintiffs and counsel for defendant shall meet promptly following issuance of this

Order to establish procedures for determining the precise monetary amounts due to each class plaintiff pursuant to the provisions of this Order. All initial computations shall be made by defendant and all costs incurred in making said determinations shall be borne by defendant. The procedures adopted shall be such as to assure that payments shall be made as soon as possible, but in no event more than three months after this order (unless the Special Master, for good cause shown, extends that deadline with respect to particular employees as to whom disputes have arisen concerning entitlement or computation). Any disputes as to any individual's entitlement or computation which cannot be resolved by agreement of counsel shall be referred to the Special Master for disposition.

### XII. IMPLEMENTATION

It is

FURTHER ORDERED, that counsel for plaintiffs and counsel for defendant shall be responsible, for a period of three years following entry of the Order, for taking such steps as may be necessary to assure compliance with this Order, in accordance with the procedure described in this paragraph. Any complaint by any class plaintiff or by counsel for any party that the provisions of this Order have been violated shall be discussed initially by counsel. If they agree as to the correct disposition of a complaint, they may effectuate said disposition without the need for referring it to the Special Master, but shall maintain a written record of said complaint and disposition. If they do not agree as to the correct disposition of a complaint, any one of them may refer the matter to the Special Master for disposition. Defendant shall pay all reasonable expenses incurred by counsel in performing the functions assigned to them in this paragraph, and shall pay a reasonable attorneys' fee to the plaintiffs' attorneys for their services therefor.

### XIII. COSTS AND ATTORNEYS FEES

It is

FURTHER ORDERED, that defendant shall reimburse plaintiffs for all reasonable costs and expenses incurred on their behalf in litigating this action. Counsel for plaintiffs, on or before the 90th day following entry of this Order, shall file an appropriate motion in this regard with the Court, and the Court shall thereupon determine the appropriate amount thereof; and it is

FURTHER ORDERED, that defendant shall pay reasonable attorneys' fees for plaintiffs' legal representation in this action. Counsel for plaintiffs, on or before the 90th day following entry of this Order, shall file an appropriate motion in this regard with the Court, and the Court shall thereupon determine the appropriate amount thereof.

### XIV. THE COURT'S JURISDICTION

It is

FURTHER ORDERED, that in the event matters relating to this Order require the attention of the Court, the Court shall assert jurisdiction of this cause for the purpose of issuing any additional orders needed to effectuate, clarify, or enforce the full purpose and intent of this Order.

EXHIBIT A
TO
ORDER

| Dorothy M. Thompson | July 24, 1974 |
| S. Vera E. Burnette | July 24, 1974 |
| Melrie H. F. Aisquith | July 24, 1974 |
| Shirley S. Alston | July 24, 1974 |
| Bertha T. Gaither | July 24, 1974 |
| Mabel R. Bradshaw | April 15, 1976 |
| Tulor C. Davis | April 15, 1976 |
| Catherine Guthrie | April 15, 1976 |
| Vida Schaeffer | April 15, 1976 |
| Margarita R. Zambrani | April 15, 1976 |
| Verna Poore | April 15, 1976 |
| Ida M. Hales | April 15, 1976 |
| Helen M. Ross | April 15, 1976 |
| Alma M. Edwards | April 15, 1976 |
| Virginia S. Stalnaker | April 15, 1976 |
| Ruth H. Stokes | April 15, 1976 |
| Edna S. Insley | April 15, 1976 |
| Mence R. Longsheth | April 15, 1976 |
| Barbara Carter | April 15, 1976 |
| Delia Beecher | April 15, 1976 |
| Lena Pirro | April 15, 1976 |
| Sara Hodges | April 15, 1976 |
| Melvina Moore | April 15, 1976 |
| Ruth Morningstar | April 15, 1976 |
| Annette F. Young | April 15, 1976 |
| Margaret S. Kenshaw | April 15, 1976 |
| Gertrude A. Brooks | April 15, 1976 |
| Rita G. Johnson | March 7, 1979 |